# Ronald Lee Fitzgerald

# V.

# Commonwealth of Virginia

Record Nos. 941426 and 941586

March 3, 1995

Present: All the Justices

*Sam Garrison (Richard Lee Lawrence,* on brief), for appellant.
*Thomas D. Bagwell, Assistant Attorney General (James S. Gilmore, III, Attorney General; Robert B. Beasley, Jr., Assistant Attorney General,* on brief), for appellee.

JUSTICE HASSELL delivered the opinion of the Court.

In these appeals, we review the capital murder convictions, sentences of death, and related convictions imposed upon Ronald Lee Fitzgerald.

# I.

## PROCEEDINGS

On April 19, 1993, Fitzgerald was indicted for the following offenses: the capital murder of Coy M. White during the commission of robbery while armed with a deadly weapon in violation of Code § 18.2-31; robbery of Coy White by presenting a firearm in violation of Code § 18.2-58; breaking and entering the dwelling house of Coy White while armed with a deadly weapon with the intent to commit rape and robbery in violation of Code § 18.2-90; capital murder of Hugh Edward Morrison in the commission of robbery while armed with a deadly weapon in violation of Code § 18.2-31; robbery of Hugh Edward Morrison by presenting a firearm in violation of Code § 18.2-58; seizure, transport, and detention of Claudia Denise White with the intent to defile her in violation of Code § 18.2-48; rape of Claudia White in violation of Code § 18.2-61; seizure, transport, and detention of Tiffany Lovelace with the intent to defile her in violation of Code § 18.2-48; and rape of Tiffany Lovelace in violation of Code § 18.2-61.

Fitzgerald was tried before a jury and found guilty of the charged offenses. The jury fixed Fitzgerald's punishment at life imprisonment for the robbery of Coy White, 30 years' imprisonment for breaking and entering the dwelling of Coy White while armed with a deadly weapon with the intent to commit rape or robbery, life imprisonment for the abduction of Claudia White, life imprisonment for the rape of Claudia White, 40 years' imprisonment for the abduction of Tiffany Lovelace, 40 years' imprisonment for the rape of Tiffany Lovelace, and life imprisonment for the robbery of Hugh Morrison.

In the penalty phase of the bifurcated capital murder trial, the jury fixed Fitzgerald's punishment at death for the capital murder of Coy White premised upon a finding of the future dangerousness predicate, Code § 19.2-264.2, and fixed Fitzgerald's punishment at death for the capital murder of Hugh Morrison premised upon a finding of the vileness "and/or" future dangerousness predicates. *Id.* After considering a report prepared by a probation officer pursuant to Code § 19.2-264.5, the trial court sentenced Fitzgerald in accord with the jury verdicts.

We have consolidated the automatic review of Fitzgerald's death sentences with his appeal of the capital murder convictions. Code § 17-110.1(F). Fitzgerald's appeal of his non-capital convic-

tions was certified from the Court of Appeals, Code § 17-116.06, and consolidated with his capital murder appeal and given priority on our docket.

## II.

## THE CRIMES

On January 29, 1993, about 6:00 a.m., Claudia White, 13 years old, was awakened in her home, located in Chatham, by a noise that sounded like a door "slam." Claudia was in bed when she heard this noise. She looked up and saw a man wearing a mask over his face. The man stood in the doorway and pointed a "silver looking" gun at her.

The man continued pointing the gun at Claudia and told her to take off her clothes and be quiet. The man removed Claudia's underpants and shirt. When the man took off his mask, Claudia immediately recognized her assailant as Fitzgerald. Claudia had seen Fitzgerald on numerous occasions because he had dated her cousin, Amanda White.

Fitzgerald took Claudia to another room and began to rub her chest. Fitzgerald knew that Claudia's father, Coy White, had taken Claudia's older sister to work and that he would soon return to the home. Fitzgerald asked Claudia which door her father would enter upon his return. Fitzgerald and Claudia saw White drive his car into the driveway. Fitzgerald told Claudia to be quiet and instructed her not to say anything.

As White entered the front door, he saw Claudia and then he saw Fitzgerald. After White said, "what are you doing with my daughter?", Fitzgerald told him to get on the floor. As White was getting on the floor, Fitzgerald shot him in the neck. The bullet severed White's spinal cord, killing him.

Claudia asked Fitzgerald why he killed her father. Then, Fitzgerald pointed the gun at her and told her to get her father's money and car keys. Claudia removed her father's wallet and car keys from his body and gave them to Fitzgerald.

After Fitzgerald permitted Claudia to put on some clothes, he took her outside, and they got into her father's car. She started the car at his direction. He pushed her to the front passenger seat, drove to a wooded area some distance from her home, removed her clothes, and raped her inside the car. After he raped her, he gave her his shirt and coat and locked her in the trunk of the car.

Eventually, Claudia was able to free herself by using a hammer she had found in the trunk.

Later, about 7:45 a.m. the same morning, Hugh Morrison, a taxicab driver in Chatham who knew Fitzgerald, picked up Kathryn Davis to take her to her place of employment. En route, Morrison and Davis saw Fitzgerald standing near a stop sign at the intersection of State Business Route 29 and State Route 629. Fitzgerald "flagged [Morrison] down" and asked him for a ride to Gretna. Fitzgerald got in the taxicab. When Davis arrived at her destination, she left the taxicab, and Morrison drove off with Fitzgerald.

About 10:00 a.m. that morning, Douglas Shelton stopped his truck on the side of State Route 637 and saw Morrison's body lying in a nearby creek. Morrison had been shot three times. One bullet caused a "graze" wound to his head. Another bullet entered his neck and lacerated his spinal cord. The final bullet entered his chest and was found in his abdomen. Both the neck and chest wounds were fatal.

Later that same morning, Tiffany Lovelace heard a car horn outside her house, looked out of a window, and saw a taxicab. She did not respond to the horn because she thought that a taxicab driver had come to pick up her sister who, as it happened, had already left the house. About 15 minutes later, Lovelace heard a knock on her window. She looked out the window and did not see anyone. She looked out a door and saw Fitzgerald.

She opened the door, and Fitzgerald walked in. Lovelace was acquainted with Fitzgerald. Lovelace's boyfriend, Girard L. Younger, was Fitzgerald's friend. Initially, Fitzgerald told Lovelace that he had come to her home to meet Younger.

Later, Fitzgerald told Lovelace to go into one of the bedrooms in her home. Fitzgerald followed her into the bedroom, removed a pistol that he had concealed, and told her, "I don't want to have to hurt you, but um, I will." He directed her to take her clothes off, and she refused. He told her again that he did not want to hurt her, and then he shot the gun, and a bullet entered the floor by her feet. In response to Lovelace's question, "why [are you] doing this?", Fitzgerald responded that Lovelace's boyfriend, Younger, had raped Amanda White, who was Fitzgerald's girlfriend.

Lovelace removed her clothes and sat on the bed. Then, Fitzgerald told her "come on," permitted her to put on some of her cloth-

ing, and forced her out of the house and into the taxicab. She told Fitzgerald that she needed to get her children, and he initially responded, "no." He changed his mind and permitted her to bring her children.

Fitzgerald took Lovelace and her children to a motel in the town of Altavista in Campbell County. They arrived at the motel about 9:00 a.m., and Fitzgerald rented a room. When Fitzgerald, Lovelace, and the children entered the room, Fitzgerald ordered Lovelace to place the children on the bed, and he took her into a bathroom and raped her.

After Fitzgerald had raped Lovelace, he put his clothes on. Upon leaving the motel, Fitzgerald saw Sonya Myers Covington and John Covington, who were guests at the motel. Fitzgerald asked Sonya if she and John would give Fitzgerald, Lovelace, and the children a ride because his car "had broken down."

The Covingtons took Fitzgerald, Lovelace, and her children to Lovelace's home in Chatham. After Lovelace and her children got out of the car, Fitzgerald told the Covingtons that he wanted to go to the courthouse because he "had got into some trouble." En route to the courthouse, Fitzgerald asked if he could throw something out of the car window. Sonya observed Fitzgerald as he threw some keys out of the window. Fitzgerald also gave the Covingtons a sum of money.

When Fitzgerald and the Covingtons had arrived at the courthouse and John had parked the car, Sonya "heard a click." She turned around and saw Fitzgerald in the back seat with a gun in his mouth. Sonya jumped out of the car, and John took the gun from Fitzgerald. Shortly thereafter, the police apprehended Fitzgerald, and John gave the gun and the money to the police.

On the afternoon of January 29, 1993, T. L. Nicholson, an investigator with the Pittsylvania County Sheriff's Office, took Fitzgerald to the intersection of State Route 691 and State Business Route 29. At Fitzgerald's direction, they found White's wallet that Fitzgerald had buried under a "clump of grass" and a ski mask that Fitzgerald had thrown into a small briar patch.

The pistol that Covington had taken from Fitzgerald and given to the police was a Bryco .380-caliber semi-automatic pistol. Claudia White testified that this pistol looked like the same pistol that Fitzgerald used to kill her father. This pistol had also been used to kill Morrison. Fitzgerald also used this pistol when he shot the bullet into the floor at Lovelace's home.

The police recovered glass particles from Morrison's taxi-cab, the site where Morrison's body was found, and Fitzgerald's clothing. The glass particles had similar optical properties and could have come from the same source. Sperm and seminal fluid were found in the vaginal areas and on the thighs and buttocks of Claudia White and Lovelace. The samples were insufficient, however, for DNA testing. Fitzgerald's fingerprints were found in Coy White's car and Morrison's taxicab. The police also recovered the keys that Fitzgerald had thrown out of John Covington's car. The keys belonged to Coy White.

## III.

## THE PENALTY PHASE

During the penalty phase of the trial, Fitzgerald asked the court to submit the following jury instruction, which was refused:

The court instructs the jury that under Virginia law any person convicted of three separate felony offenses of murder, rape or robbery by the presenting of firearms or other deadly weapon or any combination of the offenses of murder, rape or robbery when such offenses were not part of a common act, transaction or scheme shall not be eligible for parole.

Relying upon *Simmons* v. *South Carolina*, 512 U.S. ____, 114 S.Ct. 2187 (1994), Fitzgerald argues that the jury should have been permitted to determine whether he was ineligible for parole and, therefore, he was entitled to the refused instruction. The Commonwealth, however, contends that the trial court properly refused the proposed instruction because the issue of parole eligibility is a question of law that the court, not a jury, must decide. The Commonwealth further argues that, under Code § 53.1-151(B1), Fitzgerald is parole eligible. We agree with the Commonwealth.

Questions of law lie within the sole province of the court. As we have stated:

It is, indeed, a maxim of the law, almost coeval with the institution of juries, that it is the office of the judge to respond as to the law, and the jury as to the facts, and few rules are more essential in the administration of justice.

*Brown* v. *Commonwealth*, 86 Va. 466, 471, 10 S.E. 745 (1890); *accord Gottlieb* v. *Commonwealth*, 126 Va. 807, 812, 101 S.E. 872, 874 (1920). The question whether an accused is parole eligible in Virginia is a question of law that may not be considered by a jury. Hence, the trial court did not err by refusing the proposed instruction.

 We also observe that, as a matter of law, Fitzgerald was not parole ineligible. Code § 53.1-151(B1) states in relevant part:

> Any person convicted of three separate felony offenses of (i) murder, (ii) rape or (iii) robbery by the presenting of firearms or other deadly weapon, or any combination of the offenses specified in subdivisions (i), (ii) or (iii) *when such offenses were not part of a common act, transaction or scheme shall not be eligible for parole.*

(Emphasis added).

Even though the jury found that Fitzgerald had committed three felony offenses involving murder, rape, and robbery by the presenting of a firearm, we hold that these offenses were part of a common act, transaction, or scheme.* Fitzgerald committed all these offenses within several hours. He used the same pistol. Each of the victims had either a direct or indirect connection to Amanda White. Fitzgerald repeatedly told Lovelace he was raping her because he believed that Younger had raped Amanda White. Coy White was Amanda White's uncle, and Claudia White is her cousin. Morrison had been acquainted with Amanda White, and Fitzgerald believed that Morrison had made inappropriate sexual advances to her. Fitzgerald used Morrison's taxicab when he abducted Lovelace. Fitzgerald's common scheme is best illustrated by a letter he wrote to Amanda White after his arrest. He stated, "You just don't know how many people I was going to kill over you girl. I tried to keep them off you but I couldn't."

 In *Simmons*, 512 U.S. at ____, 114 S.Ct. at 2190, the Supreme Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." Here, *Simmons* is not implicated because, as a matter of law, Fitzgerald is not parole ineli-

---

* Fitzgerald had not been convicted of any of the crimes enumerated in Code § 53.1-151(B1) before he committed the crimes that are involved in this appeal.

gible. *See Ramdass* v. *Commonwealth*, 248 Va. 518, 450 S.E.2d 360 (1994); *Wright* v. *Commonwealth*, 248 Va. 485, 450 S.E.2d 361 (1994).

## IV.

## POST-TRIAL MOTION

Fitzgerald argues that the trial court erred in refusing to set aside the jury verdict and grant him a new trial because a juror had failed to disclose during *voir dire* that his granddaughter had been sexually molested as a child. Thus, Fitzgerald contends that his right to a trial by an impartial jury under the Sixth and Fourteenth Amendments to the Constitution of the United States and Article I, Section 8 of the Constitution of Virginia, was abridged. The Commonwealth argues, however, that the trial court properly refused Fitzgerald's post-trial motion for a new trial. We agree with the Commonwealth.

During the *voir dire* of the venire, the court asked the following questions of James Bradshaw, who was eventually seated as a juror:

Q: Have you or any member of your immediate family been the victim of a rape, robbery, or abduction?

A: No.

. . . .

Q: Do . . . you know of any reason whatsoever, why you can not give both the defendant and the Commonwealth a fair trial basing your verdict solely on the evidence and the law as given to you by the Court? Can you do that?

A: Yes sir.

After the trial, Fitzgerald requested a new trial on the basis that Bradshaw was not truthful in his responses to the court's *voir dire* questions.

At a post-trial hearing, Paul A. Shelton, the foreman of the jury, testified that after the jury had voted unanimously to convict Fitzgerald on all the charged offenses, but before the jury had agreed upon the specific sentences to be imposed for each offense,

Bradshaw stated he had no sympathy for a rapist because either his daughter or granddaughter was molested or raped when she was 13 years old.

Bradshaw also testified at the post-trial hearing. The following colloquy occurred between Bradshaw, counsel, and the Court:

Q: You were asked at the outset of the trial whether any member of your immediate family had been a victim of a rape, robbery or abduction. Has any member of your immediate family been a victim of a rape, robbery or abduction?

A: My granddaughter, she was touched in the wrong way. She wasn't raped.

Q: Was she abducted or was she just touched?

A: Just touched.

. . . .

Q: [I]s it the type of thing that you may have held against Mr. Fitzgerald on the evidence you heard?

A: I didn't hold nothing like that against him. He was on trial, and I give him a fair sentence, the best that I could.

. . . .

THE COURT: Did your feeling about anybody that may molest a child have anything to do with your voting to convict the defendant of capital murder?

A: I don't have nothing against nobody. I've done forgive the man what done that, to me I don't have no real feelings for, and for my granddaughter, and the thing been dropped.

THE COURT: But did it require you, mentally did it have any affect on you voting guilt or innocence?

A: No sir.

THE COURT: On any of the offenses?

A: No sir.

■ Our review of the record reveals that Bradshaw testified truthfully during the *voir dire*. No one asked Bradshaw during *voir dire* whether his granddaughter had been molested. Rather, he was asked whether any member of his immediate family had been raped. Nothing in this record supports a finding that Bradshaw was not truthful during the *voir dire*. Hence, we find no merit in Fitzgerald's arguments.

## V.

## SENTENCE REVIEW

Code § 17-110.1(C) requires this Court to review the death sentences imposed on Fitzgerald, based on the trial record, to determine whether (i) the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, or (ii) the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

■ We observe that on brief, Fitzgerald states that he "relies upon this Court's expertise in conducting the automatic review of the sentences of death imposed upon him which is required by Code § 17-110.1 of the Code of Virginia of 1950, as amended, and chooses to make no argument relative to this assignment of error." We have examined the records of all capital cases reviewed by this Court, pursuant to Code § 17-110.1(E), giving particular attention to those cases where the death penalty was based upon the "future dangerousness" and the "vileness" predicates. These cases are compiled in *Breard* v. *Commonwealth*, 248 Va. 68, 445 S.E.2d 670, *cert. denied sub nom.*, *Breard* v. *Virginia*, ____ U.S. ____, 115 S.Ct. 442 (1994).

■ Upon review of these records, as well as cases in which life imprisonment was imposed, we hold that Fitzgerald's sentence of death is neither excessive nor disproportionate to sentences generally imposed by other sentencing bodies in Virginia for crimes of a similar nature. Furthermore, based upon our independent review of this record, we find nothing that suggests that Fitzgerald's sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

## VI.
## CONCLUSION

■ We find no reversible error among the issues presented by Fitzgerald's appeals. Having conducted the review mandated by Code § 17-110.1, we hold that the sentences of death should be affirmed. Accordingly, we will affirm the judgments of the trial court.

Record No. 941426 — *Affirmed.*
Record No. 941586 — *Affirmed.*