Present:  All the Justices

DEREK ROCCO BARNABEI
                        OPINION BY JUSTICE ROSCOE B. STEPHENSON, JR.
v.  Record Nos. 952168 and 952169
                                      September 13, 1996
COMMONWEALTH OF VIRGINIA

            FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                     William F. Rutherford, Judge


     In these appeals, we review a capital murder conviction and

sentence of death imposed upon Derek Rocco Barnabei (Record No.

952168), along with his conviction of rape (Record No. 952169).
                                  I
                              PROCEEDINGS


     Barnabei was charged in an indictment with capital murder,

i.e., the willful, deliberate, and premeditated killing of Sarah

J. Wisnosky in the commission of rape.  Code § 18.2-31(5).

Barnabei, in a separate indictment, also was charged with the

rape of Wisnosky.  Code § 18.2-61(A).

     In a bifurcated jury trial conducted pursuant to Code

§§ 19.2-264.3 and -264.4, Barnabei was found guilty of capital

murder and of rape.  The jury fixed Barnabei's punishment for the

rape conviction at 13 years' imprisonment, and, upon further

evidence, fixed Barnabei's punishment for the capital murder

conviction at death, based upon both the "vileness" and "future

dangerousness" predicates.  Code § 19.2-264.2.  After considering

a report prepared by a probation officer pursuant to Code § 19.2-

264.5, the trial court sentenced Barnabei in accord with the jury

verdicts.

     Pursuant to Code § 17-110.1(F), we have consolidated the

automatic review of Barnabei's death sentence with the appeal of

right of his capital murder conviction.[1]  By order entered December 7, 1995, Barnabei's appeal of his rape conviction was certified from the Court of Appeals, Code § 17-116.06, and we have consolidated that appeal with the capital murder appeal and given them priority on our docket, Code § 17-110.2.

II
THE CRIMES

On September 22, 1993, shortly after 6:00 p.m., Wisnosky's nude body was discovered floating in the Lafayette River, in the City of Norfolk.  Nearby, the police found a leather shoe, later identified as Wisnosky's, on one of the steps leading down to the river.  The police also found a washcloth, which appeared to be bloodstained.

An autopsy, performed by a state deputy medical examiner, revealed that Wisnosky had sustained at least 10 severe blows to the back and right side of her head, fracturing her skull.  The blows had been inflicted by a heavy, blunt object, such as a ball peen hammer.

The autopsy further revealed that Wisnosky had sustained bruising to her abdomen, which the examiner testified could have been caused by a blow to Wisnosky's abdomen or by the assailant's

---

[1]Barnabei has assigned 53 errors.  However, he did not discuss on brief, and thus has waived, assignments of error numbered 1, 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 21, 22, 27, 29, 30, 31, 36, 37, 42, 43, 44, 45, 46, and 49.  Rule 5:27; Williams v. Commonwealth, 248 Va. 528, 537, 450 S.E.2d 365, 372 (1994), cert. denied, ___ U.S. ___, 115 S.Ct. 2616 (1995).  In his appeal, we do consider the 14 questions discussed in his brief.

kneeling on her "to hold [her] in place."  Wisnosky also had sustained bruises to her neck and larynx, and petechiae were found on her face which, according to the medical examiner, were "a manifestation of mechanical asphyxia."[2]  These findings suggested to the examiner that Wisnosky had been "manually strangled."

Additionally, the medical examiner found bruising on the introitus of Wisnosky's vagina and a half-inch tear of her anal opening.  The examiner opined that the bruising had been sustained prior to Wisnosky's death and that the anal tear had been inflicted "very close to the time of her death."  The examiner also opined that such a tear is usually caused by "forcible stretching."

The examiner further opined that Wisnosky's death was not caused by drowning although a "little fluid" was found in her lungs.  He, however, could not rule out the possibility that Wisnosky may not have been dead when her body was put into the water.  The "primary cause" of Wisnosky's death, according to the medical examiner, was the head injuries.  The mechanical asphyxia was a contributing factor.

Wisnosky was a 17-year-old Caucasian and a student in her first year at Old Dominion University (ODU).  Nicki Vanbelkum, Wisnosky's dormitory roommate, last saw Wisnosky alive on the

---

[2]The medical examiner defined "petechiae" as small pinhead-sized hemorrhages of the capillaries.

afternoon of September 21, 1993.  Vanbelkum and Wisnosky had planned to meet later that day, but Wisnosky did not appear.

Barnabei, also a Caucasian, first arrived in the Norfolk-Virginia Beach area in August 1993.  He identified himself to others as "Serafino" or "Serf" Barnabei and claimed to have been a member of the Tau Kappa Epsilon (TKE) fraternity at Rutgers University.[3]  Soon thereafter, Barnabei began to associate with members of TKE at ODU.  He rented a room in a house that was occupied by four other young men, who were either past or present students at ODU.

Barnabei became acquainted with Wisnosky, and the two attended a number of functions at the rooming house.  On several occasions, Wisnosky spent the night with Barnabei.

On one of those occasions, Wisnosky and Vanbelkum went to Barnabei's rooming house for a "toga party," conducted by the TKE fraternity.  Wisnosky became intoxicated and refused to leave the party with Vanbelkum.  Barnabei appeared to shun Wisnosky throughout the party, and he told Thomas Walton, a TKE member, to "keep [Wisnosky] away from him because he was trying to hook up with someone else."  Walton and Daniel Paul Wilson, another student, kept Wisnosky company on the front porch of the house. When Walton and Wilson asked Wisnosky about her relationship with Barnabei, she remarked, "He is all right, but I have had better."

---

[3]This claim proved to be false.  Although Barnabei at one time had been a TKE pledge at Stockton State College in New Jersey, he never became a member of the fraternity.

About 5:00 a.m., Walton left Wisnosky asleep in Barnabei's bed, and, later that morning, Wisnosky returned to her dormitory room without incident.

The following day at a fraternity meeting, when Barnabei "was bragging about his sex life" and Walton told those in attendance about Wisnosky's remark, Barnabei became agitated. When those present began to laugh and tease him, he denied that he had had sexual intercourse with Wisnosky, stating that they had had only oral sex.

On September 22, 1993, about 1:00 a.m., William Rolland Gee, III, a TKE pledge, drove Barnabei from a TKE pledge meeting to Barnabei's rooming house. Wisnosky was in Barnabei's room when Gee departed about 45 minutes later.

Sometime in the early hours of September 22, Michael Christopher Bain, who lived in the bedroom directly above Barnabei's, began hearing very loud music emanating from Barnabei's room. Bain first stomped on the floor in an unsuccessful effort to get Barnabei to reduce the volume of the music. Bain and David Wirth, another roomer in the house, then went downstairs. They pounded on Barnabei's door for about five minutes, but no one answered, and they tried to open the door, but it was locked.

Meanwhile, Troy Manglicmot, another occupant of the house, was suddenly awakened when Barnabei rushed into his room. Speaking in a "strong, forceful tone," Barnabei demanded that

Manglicmot move his vehicle because it was blocking Barnabei's car in the driveway next to the house. Barnabei took Manglicmot's car keys, but he could not start the vehicle. Manglicmot then moved his vehicle, and Barnabei began to back his car out of the driveway. After striking the side of the house next door and nearly colliding with Manglicmot's vehicle and Wirth's truck, Barnabei "pulled out real fast" onto the street and drove away.

That same morning, about 2:30 a.m., Justin Dewall, another roomer in the house, returned to the house and was unable to find his dog. In the course of looking through the house for the dog, he knocked on Barnabei's door. When Barnabei opened the door slightly, Dewall observed that Barnabei was "stark naked" and that Barnabei's face was expressionless. Barnabei appeared "wide-eyed, open-mouthed, and he wasn't focusing on [Dewall] when he was looking at [him]."

When Wirth left the house about 7:30 that morning, he saw Barnabei asleep on a couch in the living room. Wirth asked Barnabei why he was not sleeping in his room, and Barnabei responded that "it was a long, f___ed-up story." As Wirth walked to his truck, he found a shoe near the rear of Barnabei's car. Wirth threw the shoe, which was later identified as belonging to Wisnosky, toward the back porch.

About 9:30 a.m., Barnabei telephoned Eric Scott Anderson, another TKE pledge, and asked Anderson to bring him a blanket.

When Anderson arrived at Barnabei's door, he noticed that Barnabei's waterbed, unlike on a past occasion, had no bed sheets.

In the early afternoon of September 22, Barnabei was seen by Dewall's girlfriend carrying a duffle bag and a surfboard from his bedroom. About 2:45 that afternoon, Barnabei offered Richard Patton, a TKE pledge, a ride to a fraternity sporting event. Before departing, Barnabei told Patton that he had been carrying a surfboard in his car and asked if Patton could take it to his room "because he was tired of carrying it around in his car." Patton took the surfboard to his room and put it in a closet. Upon leaving in Barnabei's car, Patton noticed "a really bad smell." Barnabei told him that the smell probably came from his "bag of laundry," a large, closed duffle bag, in the backseat of the car. Also during that afternoon, Barnabei borrowed, or tried to borrow, money from Patton and others.

About 5:30 or 6:00 p.m., he called Anderson and asked if Anderson had "heard anything." When Anderson inquired as to what Barnabei was referring, Barnabei replied, "[L]ike, oh, nothing." Barnabei then stated that he was "going away for a couple days to work with [his] dad." Barnabei went to Towson, Maryland and later to Ohio, where he was arrested in December 1993.

On September 23, several police officers went to Barnabei's rooming house, where they recovered Wisnosky's other shoe, which appeared to be bloodstained. They also recovered a pair of white

socks from atop a trash can beside the house and a towel from the rear of the house next door. The towel exhibited dark red stains.

After interviewing the occupants of the house, the police obtained a search warrant and proceeded to search Barnabei's room, which "appeared to have been abandoned." The police found stains on Barnabei's waterbed and on one of the bedroom walls, and a damp, red stain was discovered beneath a carpet. Stains also were found on the surfboard which was retrieved from Patton's bedroom. In addition, the police recovered a handwritten note which stated, "Women just don't get it."

A state forensic serologist found sperm on Wisnosky's vaginal swabs. She also found blood underneath Wisnosky's fingernails, on one of her shoes, on the surfboard, and on the washcloth and towel, and hairs and fibers on the socks, towel, and washcloth.

A state DNA analyst conducted an RFLP DNA analysis of various samples.[4] She testified that blood recovered from the waterbed frame matched that of Wisnosky and that the chances were one in 202,000 that the blood came from a Caucasian other than Wisnosky. She also stated that the chances were one in 972 million that Barnabei did not contribute the sperm found on the vaginal swabs. The analyst also determined that the stain found

[4]For a detailed explanation of DNA print identification, see Spencer v. Commonwealth, 238 Va. 275, 286-89, 384 S.E.2d 775, 781-82 (1989), cert. denied, 493 U.S. 1036 (1990).

- 8 -

under the carpet in Barnabei's room was human blood.

Another DNA analyst conducted a PCR DNA analysis of various samples.[5]  She determined that the blood recovered from the surfboard, shoe, wall, and waterbed was consistent with Wisnosky's blood type.  She testified that only 3.9 percent of the Caucasian population has the "HLA DQ$\alpha$ type" found in these samples.  She also stated that the sperm fraction recovered from the vaginal swabs was consistent with Barnabei's blood type and that only 1.9 percent of the Caucasian population has the HLA DQ$\alpha$ type found in this sample.

An expert on hair and fiber analysis determined that the socks recovered contained four pubic hairs.  These hairs were similar to samples taken from Wisnosky and dissimilar to Barnabei's samples "in all identifiable microscopic characteristics."

III<br>
PRETRIAL MATTERS<br>
A

Pretrial, Barnabei filed a motion in limine seeking to prohibit the medical examiner, who performed the autopsy, from giving an opinion whether "force was used to inflict any of the injuries to the vagina or anus of the victim."  Barnabei asserted that such testimony would invade the province of the jury on the ultimate issue whether Wisnosky was the victim of rape.

---

[5]For a detailed explanation of PCR DNA amplification, see Spencer v. Commonwealth, 240 Va. 78, 96, 393 S.E.2d 609, 620, cert. denied, 498 U.S. 908 (1990).

At a hearing on the motion, the medical examiner testified that he had found vaginal bruising and that such bruising could have been caused only by "forcible penetration of the vagina." He also said that there were various possible explanations for his findings and that he used the term "force" in a medical sense.

The examiner also testified that he had found a tear of the anus and stretching of the anal opening, which indicated to him that "forcible anal penetration" had occurred "within the past several hours prior to [the victim's] death." The examiner reemphasized, however, that he only could say "medically" that force had been used and that it was not for him to say "[w]hether a person would consent to force being used."

At the conclusion of the medical examiner's pretrial testimony, and based upon the Commonwealth's Attorney's "representations" regarding what the evidence would show, Barnabei's counsel informed the trial court that "there [was] no immediate [need] to argue the motion." Consequently, the trial court denied the motion in limine.

At trial, the medical examiner gave lengthy testimony about the autopsy and his findings. Among other things, he testified that the vaginal bruising was caused by a "violent penetration of that area."

On appeal, Barnabei claims that the medical examiner's trial testimony differed from his pretrial testimony and that the

testimony given at trial invaded the province of the jury on an ultimate issue of fact.  The record shows, however, that, during the trial, Barnabei never objected to any of the examiner's testimony.  Consequently, Barnabei's claim has been procedurally defaulted.  Rule 5:25.

B

Barnabei contends that the trial court erred in refusing to appoint a forensic pathologist to assist in his defense and to rebut the medical examiner's testimony about Wisnosky's bruises and other injuries because the only evidence of rape adduced at trial was the medical examiner's testimony.  He asserts that the Supreme Court's holding in Ake v. Oklahoma, 470 U.S. 68 (1985), dictates this result.

We addressed a similar contention in Husske v. Commonwealth, 252 Va. ___, ___, ___ S.E.2d ___, ___ (1996) (this day decided), wherein we said that, in certain circumstances, the Due Process and Equal Protection Clauses of the Constitution of the United States require the appointment of an expert, at the Commonwealth's expense, to assist an indigent defendant in his defense.  We made clear, however, that an indigent defendant's constitutional right to the appointment of an expert is not absolute.  We held, instead, that

> an indigent defendant who seeks the appointment of an expert witness, at the Commonwealth's expense, must demonstrate that the subject which necessitates the assistance of the expert is "likely to be a significant factor in his defense," Ake, 470 U.S. at 82-83, and that he will be prejudiced by the lack of expert assistance. Id. at 83.  An indigent defendant may

- 11 -

satisfy this burden by demonstrating that the services of an expert would materially assist him in the preparation of his defense and that the denial of such services would result in a fundamentally unfair trial.

Id. at ___, ___ S.E.2d at ___ (slip op. at 11-12).

Thus, an indigent defendant seeking the appointment of an expert has the burden of showing a particularized need therefor. The required showing must be determined on a case-by-case basis, and a determination whether an adequate showing has been made is a matter that rests within a trial court's discretion. Id. at ___, ___ S.E.2d at ___ (slip op. at 12).

We think that, in the present case, Barnabei failed to make the particularized showing that would have entitled him to the appointment of an expert forensic pathologist at the Commonwealth's expense. At most, Barnabei hoped or suspected that an expert might testify that the injuries to Wisnosky's vagina and anal opening did not necessarily result from force. A hope or suspicion that favorable evidence may be procured from an expert, however, is not sufficient to require the appointment of an expert. Clearly, therefore, the trial court did not abuse its discretion in denying Barnabei's request. Id. at ___, ___ S.E.2d at ___ (slip op. at 12).

C

Barnabei also contends that the trial court erred in denying his motion for a bill of particulars specifying the evidence upon which the Commonwealth intended to rely in seeking the death penalty. He contends on appeal that the trial court's refusal to

order the bill of particulars denied him his constitutional due process right to notice and an opportunity to defend against the death penalty.

When Barnabei presented argument before the trial court, however, he did not assert a constitutional basis for his motion. Instead, he "move[d] the Court _in its discretion_ to order the Commonwealth to furnish [him] a bill of particulars." (Emphasis added.) Consequently, his constitutional argument is procedurally defaulted. Rule 5:25.

D

Barnabei further contends that the Commonwealth suppressed certain exculpatory evidence thereby depriving him of a fair trial. On brief, however, Barnabei makes many conclusional assertions that are either procedurally defaulted or meritless. Only one contention warrants discussion.

Barnabei filed a motion seeking all witness statements, which had been taken by the police, concerning the nature of his sexual relationship with Wisnosky. After an _in camera_ examination of the statements, the trial court permitted Barnabei to examine two of five pages of one individual's statement. The trial court determined that the remaining statements were not exculpatory and sealed them.[6]

---

[6]The statement which the court permitted Barnabei to examine was that of Thomas Walton. Walton stated that he had asked Wisnosky about her sexual relations with Barnabei and that Wisnosky had replied, "He was good, but I've had better."

We have examined the sealed statements and find that one undisclosed statement, made by Michael Bain, appears to be equally as exculpatory as the one revealed. Bain stated that he heard Barnabei ask Wisnosky if she liked anal intercourse and that Wisnosky smiled and nodded her head affirmatively.

At trial, however, Bain, a Commonwealth's witness, testified about the same incident during both direct examination and cross-examination. Consequently, we hold that, assuming the trial court erred in sealing Bain's statement, the disclosure at trial of the incident made any such error harmless beyond a reasonable doubt.

## IV
## JURY MATTERS

Barnabei contends that the trial court erred in removing for cause prospective jurors Charles Bazzell and Mary Howell.

During voir dire, Bazzell advised the court that he had "an opinion [that] would prevent [him] from convicting anyone of an offense which is punishable with death." Upon further questioning, he told the court that he "[did] not believe in the death penalty." In response to a question from defense counsel, however, Bazzell stated that there were crimes, such as the Oklahoma City bombing, for which he would consider imposition of the death penalty. He said he thought it was "possible" that his beliefs would prevent or substantially impair his ability to follow the court's instructions, but he would not know until he heard the evidence. Finally, he conceded that his personal

- 14 -

opposition to the death penalty "would make it difficult for [him] to consider the Court's instructions" requiring him to consider imposition of a death sentence.

Also during voir dire, Howell, a member of the Maryland Bar, initially told the court that she had beliefs "which would prevent [her] from voting or substantially impair [her] ability to vote for imposition of the death penalty upon an individual convicted of capital murder." Later, she said her beliefs would not prevent or hinder her consideration of the death penalty "under the appropriate circumstances." Subsequently, however, in response to questioning by the court, she again stated that her beliefs would prevent or substantially impair her from voting to impose the death penalty, adding, "I am opposing the death penalty." She admitted that she was "not answering clearly" and that her voir dire "may sound conflicting."

The appropriate standard for determining when a prospective juror may be excluded for cause because of the juror's views about the death penalty is whether the juror's views would substantially impair or prevent the performance of his duties as a juror in accordance with his oath and the court's instructions. Wainwright v. Witt, 469 U.S. 412, 424 (1985). Application of this standard rests within the sound discretion of the trial court, and its ruling to exclude a prospective juror will not be disturbed on appeal unless the ruling constitutes manifest error. Yeatts v. Commonwealth, 242 Va. 121, 134, 410 S.E.2d 254, 262

- 15 -

(1991), cert. denied, 503 U.S. 946 (1992). The trial court is accorded such deference because it sees and hears the prospective jurors. Weeks v. Commonwealth, 248 Va. 460, 475, 450 S.E.2d 379, 389 (1994), cert. denied, ___ U.S. ___, 116 S.Ct. 100 (1995); Pope, 234 Va. at 123-24, 360 S.E.2d at 358. Finally, in determining whether a prospective juror should have been excluded for cause, we review the entire voir dire, rather than a single question and answer. Fitzgerald v. Commonwealth, 223 Va. 615, 628, 292 S.E.2d 798, 805 (1982), cert. denied, 459 U.S. 1228 (1983).

When we examine the entire voir dire of Bazzell and of Howell in light of the foregoing principles of law, we cannot say that the trial court committed manifest error in excluding them for cause. Indeed, we think the trial court reasonably concluded that both these prospective jurors were opposed to the death penalty and that their views would have prevented or substantially impaired their performances as jurors in accordance with their oaths and the court's instructions.

V
GUILT PHASE

Barnabei contends that the evidence is insufficient to support the jury's finding that he raped Wisnosky and, therefore, that he cannot be found guilty of capital murder. More specifically, he asserts that "there was literally no evidence of his having forced or used the threat of force to engage in sexual relations with [Wisnosky]." We do not agree.

- 16 -

The evidence clearly supports the finding that Barnabei and Wisnosky had sexual intercourse prior to Wisnosky's death. The sperm found on Wisnosky's vaginal swabs was consistent with Barnabei's blood type, and the chances were one in 972 million that someone other than Barnabei contributed the sperm. The evidence also supports the finding that Barnabei used force or the threat of force. The medical examiner found bruising on the introitus of Wisnosky's vagina and tearing of her anal opening, and he testified that the bruising was caused by "violent penetration." The examiner also found bruising on the abdomen, and he testified that the bruising could have been caused by the assailant's kneeling on Wisnosky "to hold [her] in place." When this evidence is considered in conjunction with Wisnosky's other brutal injuries, we hold that the evidence clearly supports the jury's finding that Wisnosky had been raped.

## VI
## PENALTY PHASE
### A

Seven witnesses testified in the penalty phase of the trial. The Commonwealth called Sandra Ann Joaquin and Paula Barto; Barnabei presented Charles A. Parker, Harvey L. Smith, Carla DiSantis, Craig Barnabei, and Shannon Moore McHale.[7]

---

[7] Barnabei also called Dr. David Ray Faber, II, "a specialist in adult general psychiatry and forensic and administrative psychiatry," who had been appointed by the trial court to perform various psychological examinations on Barnabei. Dr. Faber testified, out of the jury's presence at Barnabei's request, that he did not find any "psychological mitigating factors that could be presented to the jury." He also testified that he did not find anything to indicate that Barnabei was suffering from any

Joaquin testified that she had had an "[o]n and off" romantic relationship with Barnabei during 1989 and 1990, while they were students at Stockton State College, in New Jersey. On a number of occasions, Barnabei had been "physically violent" with her. On one occasion, he had "head butted" Joaquin approximately three times, resulting in her seeking treatment for a concussion. On another occasion, Barnabei had thrown her against a wall and grabbed her tightly by the throat. Another time, he had kicked her "between the legs," "grabbed" her, and "smacked" her head. Although Barnabei had threatened to kill Joaquin if she complained to the police, she finally filed "harassment charges" against him. She ultimately agreed to drop the charges in exchange for Barnabei's agreeing to leave her alone.

Barto, Barnabei's former wife, also testified about his aggressive behavior. She recounted that he had slapped her face hard enough to leave "marks," had thrown her against a wall, and had forced her to have anal intercourse against her will. Barnabei had told Barto that, if she ever left him, he would find and kill her. Barto finally left Barnabei on June 24, 1988, and, thereafter, Barnabei left many threatening telephone messages on her parents' answering machine. In one message, he said that he was going to burn her father's business.

(..continued)
type of mental disease or defect that the jury could consider in mitigation of Barnabei's punishment.

Parker, the mayor of Somers Point, New Jersey, a city of about 12,000 citizens, testified that he was familiar with the Barnabei family. He knew Barnabei as a young, grade school boy when Barnabei received an academic award. However, he had not seen Barnabei for "probably four or five years."

Smith, a councilman in Somers Point, testified that he had known the Barnabei family socially since 1979. He recalled that Barnabei "was one of the talented, gifted students" and that Barnabei received an award when he finished the eighth grade. However, he also had not seen Barnabei for "several years."

DiSantis testified that she had first become acquainted with Barnabei in July 1993, and, in the fall of that year, they had begun to date. In December 1993, they began living together in an apartment in Cuyahoga Falls, Ohio. She and Barnabei worked in the same restaurant. Barnabei was the "floor manager," and he worked "[e]very day." They continued to live together until Barnabei was arrested. DiSantis also testified that she and Barnabei were "intimate" and "had relations." She stated that Barnabei was never aggressive with her, never struck her, and was "very sweet, very tender, always loving." She never had any "physical difficulties [with Barnabei] in [their] intimate relationship."

Craig Barnabei, the defendant's only sibling, testified about his relationship with the defendant, who is two years younger than Craig. He said that the two always had a close

relationship.  As children, they were in the "gifted and talented program."  When they were older, they "double-dated" on occasions, and he noted that girls seemed to have a "particular interest" in his brother.  Craig further testified that the defendant had been popular with other children and that he defended those who were being bullied.  Craig never saw his brother be abusive to anyone.

McHale, one of Barnabei's former girlfriends, testified that, during 1993 and before Barnabei left New Jersey, she and Barnabei had been "lovers and best friends."  She never had any "physical problems" with him, and he was never abusive or rude to her, even though she purposely tried to provoke him on an occasion.

B

Barnabei contends that the trial court erred in refusing to instruct the jury that he would not be eligible for parole for at least 25 years.  He asserts that the Supreme Court's rationale in Simmons v. South Carolina, 512 U.S. ___, 114 S.Ct. 2187 (1994), applies to his case.  We disagree.

Simmons applies only to capital defendants who are ineligible for parole.  Barnabei is not parole-ineligible.  See, e.g., Roach v. Commonwealth, 251 Va. 324, 336, 468 S.E.2d 98, 111 (1996); Joseph v. Commonwealth, 249 Va. 78, 84, 452 S.E.2d 862, 866, cert. denied, ___ U.S. ___, 116 S.Ct. 204 (1995); Fitzgerald v. Commonwealth, 249 Va. 299, 306-07, 455 S.E.2d 506, 510-11

(1995), <u>cert</u>. <u>denied</u>, ___ U.S. ___, 116 S.Ct. 1279 (1996).

C

Barnabei also contends that the trial court erred in refusing proposed jury instructions B, C, and D, which relate to mitigating factors and sentence alternatives. Again, we do not agree. We conclude that the refused instructions, to the extent they accurately stated the law, were unnecessary in view of the instructions given.[8] Indeed, the instructions given by the trial court were virtually identical to those we previously have affirmed. <u>See</u>, <u>e.g.</u>, <u>Gray</u>, 233 Va. at 350-51, 356 S.E.2d at 178.

D

Two of Barnabei's contentions regarding certain rulings of the trial court in the penalty phase are procedurally defaulted. Although Barnabei contends on appeal that the instructions regarding the "vileness" and "future dangerousness" predicates were vague and incomplete, he did not object when the instructions were given. Therefore, we cannot consider this contention. Rule 5:25.

Barnabei also contends on appeal that it is unclear from the jury's verdict whether it based its verdict upon one or both of the aggravating factors because the verdict contains the term "and/or." Thus, he asserts, the verdict "is not meaningfully or

---

[8]Instruction B was obviously improper because it would have incorrectly told the jury that Barnabei had "no significant history of prior criminal activity" and that "[t]he victim consented to the act" of intercourse.

rationally reviewable."  Again, however, Barnabei did not object

to the verdict when it was returned by the jury or when judgment

was entered thereon.  Thus, this contention is procedurally

defaulted.  Rule 5:25.[9]

E

Prior to trial, Barnabei filed a motion pursuant to Code

§ 19.2-264.3:2 to require the Commonwealth to provide notice of

any unadjudicated criminal conduct which it intended to present

in the penalty phase.  Code § 19.2-264.3:2 provides, in pertinent

part, the following:

> Upon motion of the defendant, in any case in which
> the offense for which the defendant is to be tried may
> be punishable by death, if the attorney for the
> Commonwealth intends to introduce during a sentencing
> proceeding held pursuant to § 19.2-264.4 evidence of
> defendant's unadjudicated criminal conduct, the
> attorney for the Commonwealth shall give notice in
> writing to the attorney for the defendant of such
> intention.  The notice shall include a description of
> the alleged unadjudicated criminal conduct and, to the
> extent such information is available, the time and
> place such conduct will be alleged to have occurred.

Approximately three weeks prior to trial, the Commonwealth

filed a 12-page notice, detailing numerous incidents of

unadjudicated criminal conduct which it intended to present.  The

notice alleged, inter alia, that, during the time that Barnabei

had been married to Paula Barto, he had "engaged in a continuous

---

[9]Also defaulted are Barnabei's generalized claims that the
trial court treated him unfairly and was biased in favor of the
Commonwealth.  Further, we find no merit to the claim that the
court had an ex parte communication with the Commonwealth's
witness, Michael Bain.

course of threatening and assaultive conduct against [her], said conduct occurring on such a continuous and regular basis that [she could not] recall each and every specific date and occasion upon which such threatening and assaultive conduct occurred."

During the penalty phase of the trial, Barto testified about her marriage to Barnabei and about various threats and acts of violence he had inflicted upon her. During her testimony, Barto related one incident when Barnabei had attempted to have anal intercourse with her, but she successfully had resisted the attempt. Barnabei then objected and moved for a mistrial, asserting that the Commonwealth's notice had not adequately apprised him of that specific incident. The trial court overruled the objection, and Barto further testified, over Barnabei's renewed objection, that Barnabei had forced her to have sexual intercourse with him on other occasions.

Barnabei contends on appeal that the trial court erred in allowing Barto to testify about incidents that were not specifically alleged in the notice. We do not agree. We think the Commonwealth's allegations that Barnabei engaged in "assaultive conduct" against Barto and that Barto could not recall "each and every . . . occasion" were sufficient to allow the admission of her testimony. Moreover, the ruling rested within the trial court's sound discretion, and, clearly, the court did not abuse its discretion in admitting the testimony.

F

Barnabei asserts that, to the extent his sentence was based upon a finding of either "vileness" or "future dangerousness," "it was in violation of [his] rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments of the United States Constitution" and that each predicate "of the Virginia death penalty statute was unconstitutionally used and found by the sentencer." We interpret Barnabei's assertion to be that his sentence should be vacated because the aggravating factors set forth in the capital murder statute are unconstitutionally vague.

We previously have rejected this contention. See, e.g., Joseph, 249 Va. at 82-83, 452 S.E.2d at 865-66; Breard v. Commonwealth, 248 Va. 68, 74, 445 S.E.2d 670, 675, cert. denied, ___ U.S. ___, 115 S.Ct. 442 (1994). Adhering to our previous holdings, we again reject the contention.[10]

## VII
## SENTENCE REVIEW

Code § 17-110.1(C) requires this Court to review Barnabei's death sentence to determine whether the sentence (1) was imposed under the influence of passion, prejudice, or any other arbitrary factor; or (2) is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. We conduct this review even though Barnabei makes no claim that his sentence was the product of any arbitrary factor

---

[10]Although Barnabei does not explain why the evidence is insufficient to prove either statutory aggravating factor, we conclude, nonetheless, that the jury's finding in that regard is fully supported by the evidence.

or that it is excessive or disproportionate.

From our independent review of the record, we have found nothing to suggest that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

Next, in considering whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, we must determine whether other sentencing bodies in this jurisdiction generally impose the death penalty for comparable or similar crimes, considering both the crime and the defendant. Roach, 251 Va. at 350, 468 S.E.2d at 113. Consequently, we have compiled and examined the records of all capital murder cases reviewed by this Court, Code § 17-110.1(E), including both cases in which the death sentence was imposed and cases in which life imprisonment was imposed. In doing so, we have given particular attention to those cases in which the death sentence was based upon both the "vileness" and the "future dangerousness" predicates.

From this review, we conclude that Barnabei's death sentence is neither excessive nor disproportionate to penalties generally imposed by other sentencing bodies in the Commonwealth for similar and comparable crimes. See, e.g., Goins v. Commonwealth, 251 Va. 442, 469-70, 470 S.E.2d 114, 132 (1996); Sheppard v. Commonwealth, 250 Va. 379, 395, 464 S.E.2d 131, 141 (1995), cert. denied, ___ U.S. ___, 116 S.Ct. 1332 (1996); Graham v. Commonwealth, 250 Va. 79, 89, 459 S.E.2d 97, 102, cert. denied, ___ U.S. ___, 116 S.Ct. 535 (1995); Breard, 248 Va. at

89, 445 S.E.2d at 682; <u>Spencer</u>, 238 Va. at 318-20, 384 S.E.2d at 799-800.

## VIII
## CONCLUSION

We have considered all issues discussed in Barnabei's brief and find no reversible error.  After conducting the sentence review pursuant to Code § 17-110.1, we hold that the capital murder conviction and the sentence of death should be affirmed. Accordingly, we will affirm the trial court's judgments.

Record No. 952168--<u>Affirmed</u>.
Record No. 952169--<u>Affirmed</u>.