# COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:    Judges Beales, Causey and Senior Judge Haley
Argued at Richmond, Virginia


PAUL ALLEN MARSHALL

MEMORANDUM OPINION[*] BY
v.        Record No. 0519-22-2            JUDGE DORIS HENDERSON CAUSEY
APRIL 16, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF KING GEORGE COUNTY
Herbert M. Hewitt, Judge

Timothy W. Barbrow (Law Office of Timothy W. Barbrow, on
brief), for appellant.

Matthew P. Dullaghan, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


After a jury trial, Paul Allen Marshall was convicted of attempted murder, aggravated

malicious wounding, strangulation, abduction, and using a firearm in the commission of a felony.

Collectively, he was sentenced to 33 years of imprisonment total.  Marshall raises 14 assignments of

error on appeal.  We affirm the trial court's judgment.

## BACKGROUND[1]

In February 2018, for a period of about six weeks, Sabrina Rice was in a romantic

relationship with Marshall, and they lived in her car, a white Ford Focus.  While in Maryland on

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] "In accordance with familiar principles of appellate review, the facts will be stated in
the light most favorable to the Commonwealth, the prevailing party at trial." *Gerald v.
Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381
(2016)).  In doing so, we discard any of Marshall's conflicting evidence, and regard as true all
credible evidence favorable to the Commonwealth and all inferences that may reasonably be
drawn from that evidence. *Id.* at 473.

February 26, 2018, Rice and Marshall argued about some information he found on her social media concerning her prior relationships. Marshall got angry and accused Rice of infidelity. At about 9:30 p.m., they arrived in King George County, Virginia. They parked in a secluded spot on an access road near a Walmart to spend the night. They resumed their argument, and Marshall spilled a drink on Rice. Rice said she was going to get a change of clothes in the trunk. Marshall offered to get them for her and went to the trunk of the car.

About five minutes later, Marshall asked Rice to exit the car to look at a pair of dry pants he found for her. Rice got out of the backseat on the driver's side of the car. As soon as she turned toward Marshall, he fired a gun at her, striking her in the right side of the chest. The gun was a Hi-Point Carbine nine-millimeter rifle. Rice fell backward to the ground. Marshall stood over Rice with the gun in his hands and said, "look what you made me do[,] you stupid bitch." Marshall put the gun into the trunk of the car. Marshall picked up Rice, put her in the backseat of the car, and drove away. Rice was bleeding and in excruciating pain, but Marshall refused to take her to the hospital despite her pleas for help.

Marshall drove to an abandoned house in Dahlgren. Rice begged Marshall to take her to a hospital—offering to let him keep her car after—but Marshall refused. Marshall had Rice's cell phone so she could not call for help. Eventually, Marshall fell asleep in the driver's seat of the car and Rice lost consciousness.

Early the next morning, Marshall drove to a Wawa store to get Rice a drink. He then drove back to the access road where he had shot Rice. Using tampons that were in the trunk, Marshall tried to bandage Rice's gunshot exit wound in her back. Rice passed out from the pain. When Rice awakened, Marshall had a rope around her neck and was strangling her with it. Rice fought back and pulled the rope off her neck. Marshall joked that it was rude for Rice to "pass out on him."

Later in the day, Marshall interacted with a man working nearby. Rice testified that she was too physically weak to call out to the man for help. David Miller confirmed that he was called to service a malfunctioning pumping station in the area of the access road on February 27, 2018, and that he had interacted with a male who was near a parked white car. The male gestured for Miller to back away, commenting that he was trying to change a female's bandages. Miller saw a woman inside the white car who appeared to be in pain. After speaking with Miller, Marshall drove away. Afterward, Miller found packaging from a bandage on the ground.

Marshall drove to his mother's house in Dahlgren. He ordered Rice to stay in the car while he went inside; Rice obeyed because she was afraid and weak. Marshall returned with food and water.

Marshall drove to another secluded location that he and Rice had visited before. Rice begged Marshall to get her help and promised that she would not press charges against him. Marshall still refused and drove to a nearby gas station so Rice could use the restroom. Marshall helped Rice into the bathroom located on the outside of the building. Rice locked herself inside for several minutes, but because she had no cell phone, returned to Marshall outside.

In the late afternoon, on a second visit to Wawa, Marshall left Rice's cell phone on the console of the car while he went inside the store. In his absence, Rice texted her brother, reported that Marshall had shot her, and told him that she desperately needed help. Rice's brother immediately called her; and although she could barely speak, she told him that she was in the Dahlgren area. Rice deleted her text messages to her brother before Marshall returned to the car from the store.[2] Marshall drove back to the abandoned house and fell asleep.

---

[2] During the visits to Wawa, Rice was bleeding and weak and unable to run away.

Early in the evening on February 27, 2018, King George County Police Lieutenant Patrick Westin received information through police dispatch about a 911 call reporting a possible shooting.[3] In response to the report, numerous officers searched for Rice's white Ford Focus. After receiving a "ping" on Rice's cell phone, the police found Rice's car parked behind a deserted house.

As the police neared the car, Marshall sat up in the driver's seat. The police ordered him to show his hands, then detained him. Rice was in the backseat of the car; Westin described her as "gray," in distress, incoherent, shaking, and barely able to speak. The officer removed Rice's shirt and saw that she "had a gunshot wound that appeared to be through-and-through." When Westin asked Rice about her being shot, Rice told Westin to be quiet. The officers took Rice to the steps of the house to separate her from Marshall and wait for paramedics to arrive.

Initially, while in the back of an ambulance, Rice told the police she was injured in a "drive-by" shooting in Westmoreland County. Detective Lieutenant Drew Massey, who overheard Rice's statement, doubted her account. Nonetheless, Massey investigated the specifics of Rice's report and found no indication that such a shooting had occurred.

The police seized a loaded rifle from the center portion of the Ford Focus, within arm's reach of the driver's seat. The police also found a red-stained piece of rope on the driver's seat floorboard. DNA testing showed that the stains contained Rice's genetic material.

Deputy Tyler Neiman transported Marshall to the sheriff's office in a patrol car. During the ride, Neiman did not ask Marshall any questions. Marshall was talkative, however, and commented that he belonged to a Moorish temple and that his girlfriend "almost burned him." The deputy mentioned that he was not "trying to violate [Marshall's] rights." Marshall said that his girlfriend had been "putting herself out there" on social media and sending "pictures and videos with other

---

[3] At trial, the Commonwealth played the recording of the 911 call, which came from Rice's brother.

guys." When Deputy Neiman delivered Marshall to the sheriff's office, he found a nine-millimeter bullet in Marshall's pocket.

After Rice was transported from the scene for medical treatment, Massey went to the location in the sheriff's office where the police were holding Marshall.[4] Lieutenant Massey made an audio recording of Marshall's verbal exchange with the magistrate, but the lieutenant did not participate in the conversation and asked him no questions. While before the magistrate, Marshall was "carefree" and joking and did not appear concerned that he was charged with shooting Rice. During interaction with the magistrate, Marshall discussed Rice's alleged infidelity and mentioned specific individuals he thought were involved. Marshall based his conclusion upon information that he had found in Rice's cell phone. He claimed that he had just arrived at the abandoned house before the police did and that he and Rice were waiting for her brother to pick her up and take her to the hospital. Marshall asked Lieutenant Massey about obtaining a protective order against Rice.

On the day after her rescue, while still in the hospital, Rice repeated her claim that she had been injured in a "drive-by" shooting and she made a written statement to that effect. At that time, Rice claimed that she had been taking the drug MDMA and was shot in Westmoreland County. She indicated the shot came from a champagne-colored car with three people inside it. Several times, Rice told the police that Marshall was not the person who shot her.[5]

At trial, however, Rice explained that she initially lied to the police because she was terrified of Marshall and was afraid that he had escaped from the police and was not in custody. She feared that he would send someone to "finish[ ]" "the job," meaning kill her. After discharge from the

---

[4] At the suppression hearing, Detective Monty Clift testified that he advised Marshall of his *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966), rights while in an interview room at the sheriff's office. Marshall indicated that he wished to remain silent, and the interview ended. The police then took Marshall to appear before the magistrate.

[5] During cross-examination of Rice, defense counsel played the recording of her interview with Lieutenant Karen Richards at the hospital on February 28, 2018.

hospital, Rice decided that it was not fair for her to suffer and Marshall to get away with what he had done, so she went to the police and told them that he had shot and strangled her. At trial, Rice testified unequivocally that Marshall shot and strangled her and that her statement to the police after her release from the hospital was the truth.

Rice identified the gun seized from the car as the weapon Marshall used to shoot her. From Marshall's Instagram account, the police obtained a video of him firing a rifle repeatedly and photographs of the weapon. Massey testified that the rifle in the video and photos had the same markings as those on the gun found in the car.

James Bullock, an expert in firearm analysis, examined the rifle found in the car and the sweatshirt Rice was wearing when she was shot. Based upon the gunshot residue on the shirt, he determined that the gun was fired at her from close range.

The gunshot entered Rice's chest, punctured her lung, and exited her back. At trial, Rice exhibited the scar on her right chest from the gunshot wound. Rice also had scars from the gunshot exit wound and from the surgery she endured. Rice sustained permanent damage to her carotid artery on the right side of her neck from the strangulation. Marshall was arrested on a capias for the crimes on July 19, 2018. His jury trial commenced on May 3, 2021. Following his convictions for the charged crimes, Marshall appeals.

ANALYSIS

I. Sufficiency of the Evidence

Marshall challenges the sufficiency of the evidence to sustain his convictions. "On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

A. Rice's Credibility

Marshall claims the evidence did not prove that he was the perpetrator because of Rice's inconsistent statements to the police about how she was injured. Marshall asserts that Rice initially told the police she was injured in a "drive-by" shooting and that Marshall was not responsible for the shooting. Marshall contends that these inconsistent statements rendered her trial testimony incredible and insufficient to prove that he was the person who shot and strangled her. We disagree because Rice's testimony was not inherently incredible.

"The fact finder, who has the opportunity to see and hear the witnesses, has the sole responsibility to determine their credibility, the weight to be given their testimony, and the inferences to be drawn from proven facts." *Rams v. Commonwealth*, 70 Va. App. 12, 26-27 (2019) (quoting *Hamilton v. Commonwealth*, 279 Va. 94, 105 (2010)). This Court gives "deference to the fact finder who, having seen and heard the witnesses, assesses their credibility and weighs their testimony." *Elliott v. Commonwealth*, 277 Va. 457, 462 (2009).

In light of the jury's credibility determination in finding Marshall guilty, this Court "may only . . . disturb[ ]" its conclusion "on appeal if this Court finds that [the witness'][s] testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Johnson v. Commonwealth*, 58 Va. App. 303, 315 (2011) (third alteration in original) (quoting *Robertson v. Commonwealth*, 12 Va. App. 854, 858 (1991)). "To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it

must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006) (quoting *Cardwell v. Commonwealth*, 209 Va. 412, 414 (1968)). Thus, "there can be no relief" in this Court if a witness testifies to facts "which, if true, are sufficient" to support the conviction "[i]f the trier of the facts" bases its decision "upon that testimony." *Smith v. Commonwealth*, 56 Va. App. 711, 718-19 (2010) (quoting *Swanson v. Commonwealth*, 8 Va. App. 376, 379 (1989)). Furthermore, "[t]he mere fact that a witness may have . . . given inconsistent statements during the investigation of a crime does not necessarily render the testimony unworthy of belief." *Juniper*, 271 Va. at 415; *see Snyder v. Commonwealth*, 220 Va. 792, 796 (1980) (holding that a witness's testimony, which was the sole evidence that established the elements of the offense, was not inherently incredible, even when "there were conflicts in her testimony," and "material portions of her testimony were contradicted by . . . other witnesses," such as whether the witness consented to sex). Instead, such inconsistencies are "appropriately weighed as part of the entire issue of witness credibility, which is left to the [fact finder] to de[cide]." *Juniper*, 271 Va. at 415.

Rice explained why she initially lied to the police about the "drive-by" shooting. After almost an entire day of being held in the car, unable to communicate with anyone, after Marshall shot her, Rice understandably was afraid of Marshall when the police arrived to rescue her. She was uncertain whether the police had apprehended him or if he had escaped, and she feared he might return to "finish[ ]" "the job" since he had tried to kill her by shooting and strangling her. Interestingly, the police officers who heard Rice's story about the "drive-by" shooting did not believe it, as it did not make sense for what had been reported via the 911 call. After her safety was ensured, however, Rice went to the police with the truth—that Marshall was responsible for shooting and strangling her. At trial, she testified unequivocally that her testimony was accurate.

Upon these facts and circumstances, Rice's testimony was not inherently incredible and the jury was entitled to accept it.

### B. Attempted Murder

Marshall contends that the evidence was insufficient to sustain his conviction for attempted murder. Specifically, he argues that the evidence did not prove that he intended to kill Rice. We disagree because fighting leading up to the shooting, use of a deadly weapon, aiming the weapon at the victim, shooting the victim at close range in the chest, strangling the victim with a rope around her neck, harsh words toward the victim, and failure to seek medical attention sufficiently establish an intent to kill.

"To prove the crime of attempted murder two essential elements must be established." *Hargrave v. Commonwealth*, 214 Va. 436, 437 (1974). One, "[t]he specific intent to kill the victim must be shown." *Id.* And two, "this must be coupled with evidence of some overt but ineffectual act in furtherance of this purpose." *Id.* "The use of a deadly weapon, standing alone, is not sufficient to prove the specific intent required to establish attempted murder." *Id.* In *Hargrave*, the Court held that "the use of a deadly weapon [a firearm] coupled with the defendant's other conduct and utterances, were sufficient for the trial court to find that defendant had the requisite intent to commit [attempted] murder." *Id.* In *Hargrave*, the defendant and the victim, who had been in a relationship, had been arguing about their relationship. *Id.* at 436. The defendant asked for his coat back, but the victim would not give it to him, and the defendant left. *Id.* After a few minutes, the defendant came back with a gun, and "[w]hen [the defendant] was about ten feet from [the victim], who was seated in a chair, [the] defendant told [the victim] 'to give him his coat' and fired toward her without raising the rifle to his shoulder." *Id.* at 437. "The projectile grazed [the victim] on the right shoulder causing a 'little burn' before it struck a washing machine approximately three feet behind her." *Id.*

As in *Hargrave*, the circumstances here sufficiently establish Marshall's intent to kill Rice. As in *Hargrave*, Marshall and the victim, Rice, were in a romantic relationship and had been arguing in Rice's car. Marshall spilled a drink on Rice while they were arguing in the car. Rice said she was going to get a change of clothes in the trunk, and Marshall offered to get them for her. He asked Rice to come to the trunk to see if the clothes he chose were okay. Rice got out from the backseat of her car, and as soon as she got out, Rice saw Marshall holding a gun, and he shot her at close range. After Marshall shot Rice, "[h]e stood over top of [her] with the gun in his hand and said, [']look what you made me do you stupid bitch.[']" Marshall shot the victim in the right side of her chest. Thus, here, as in *Hargrave*, argument preceded the shooting, Marshall aimed at and hit the victim, and his words demonstrated that he intended to shoot her. The facts are even more severe here—the victim in *Hargrave* was grazed on the shoulder, whereas the victim here was shot in the chest. We hold that, as in *Hargrave*, these circumstances—fighting before the overt act, use of a deadly weapon, aiming the weapon at Rice's body, shooting her at close range, strangling Rice with a rope, Marshall's harsh words toward Rice, and Marshall's failure to seek medical attention for Rice—sufficiently establish an intent to kill.

C. Aggravated Malicious Wounding

Marshall argues that the evidence was insufficient to prove that Rice suffers a permanent injury. We disagree because Rice's scars and chronic pain are permanent and significant physical impairments.

"To be convicted of aggravated malicious wounding under Code § 18.2-51.2, the injuries inflicted on the victim must be both a 'significant physical impairment' and 'permanent.'" *Alston v. Commonwealth*, 77 Va. App. 639, 650 (2023) (quoting *Lamm v. Commonwealth*, 55 Va. App. 637, 644 (2010)). "'"[P]hysical impairment" for purposes of this criminal statute' is

- 10 -

defined as 'any physical condition, anatomic loss, or cosmetic disfigurement.'" *Id.* (alteration in original) (quoting *Lamm*, 55 Va. App. at 644). "To prove an injury is permanent, the Commonwealth need not present definitive testimony that a victim's injuries will never improve, but instead can leave it to the common sense of the [factfinder] to determine if the injuries are permanent." *Id.* (alteration in original) (quoting *Lamm*, 55 Va. App. at 644-45). In *Newton v. Commonwealth*, 21 Va. App. 86 (1995), the Court held that the victim's "injuries constituted 'permanent and significant physical impairment,'" when the victim had "visible" scars, some of the wounds needed stitches, and there were a multiple "number of wounds." *Id.* at 90. In *Newton*, the Commonwealth did not present medical testimony about the victim's wounds; the victim simply "displayed his scars for the [factfinder]." *Id.* at 89.

Here, like in *Newton*, the victim testified that she had two scars—one where the bullet entered her body and one where the bullet exited her body—and showed her entrance wound scar while on the stand. She testified that she still has pain in her chest and that she has "permanent carotid artery damage on the right side of my neck. If you look closely[,] you'll see how it sticks out right here. The tattoo is just to cover the scars that were left on my neck" from being strangled. This evidence is sufficient to establish that the victim suffered a permanent and significant physical impairment.

D. Malice

Marshall argues that the evidence was insufficient to prove that he acted with malice. We disagree because shooting and strangling a person is a wrongful, intentional act that necessarily causes injury.

"Malice inheres in the 'doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will.'" *Alston*, 77 Va. App. at 648 (quoting *Tizon v. Commonwealth*, 60 Va. App. 1, 11 (2012)). "It exists when a person commits 'any purposeful and cruel act

- 11 -

without any or without great provocation.'" *Id.* (quoting *Fletcher v. Commonwealth*, 72 Va. App. 493, 507 (2020)). "Malice 'may be directly evidenced by words[ ] or inferred from acts and conduct which necessarily result in injury.'" *Id.* (alteration in original) (quoting *Ramos v. Commonwealth*, 71 Va. App. 150, 162 (2019)).

Here, Marshall acted with malice because shooting and strangling the victim were wrongful, intentional acts and also acts that necessarily result in injury. *Cf. id.* at 645, 649-50 (concluding that the defendant acted with malice when he punched the victim multiple times, knocking out and "mangl[ing]" the victim's teeth). Marshall's acts were intentional for the reasons stated in Section I.B., above. Thus, we hold that Marshall acted with malice in shooting Rice.

E. Abduction

Marshall contends the evidence was insufficient to sustain his conviction for abduction. Marshall contends that the Commonwealth failed to establish an abduction because he did not detain Rice or prevent her from leaving the car. He emphasizes that after the shooting and strangulation, he drove her to public places, leaving her alone in the car and the gas station restroom where she could have escaped or asked others for help. We disagree because Rice did not go with Marshall willingly, as she was too injured to escape.

Under Code § 18.2-47(A), "[a]ny person who, by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes another person with the intent to deprive such other person of his personal liberty . . . shall be deemed guilty of 'abduction.'" "The crime of abduction requires proof of an asportation or detention by force, intimidation or deception." *Carr v. Commonwealth*, 69 Va. App. 106, 115 (2018) (quoting *Smith v. Commonwealth*, 33 Va. App. 65, 70 (2000)). In *Crawford v. Commonwealth*, 281 Va. 84 (2011), the Supreme Court held that the evidence was sufficient that the defendant had abducted

the victim. In *Crawford*, the defendant shot the victim, took her to a motel and left her alone, and "[a]n expert witness testified that [the victim] could not move after she was shot because the bullet severed her spine." *Id.* at 103. This evidence was sufficient to show that the victim did not go with the defendant willingly. *Id.* at 104.

Here, as in *Crawford*, after Marshall shot and strangled the victim, he kept her in her car and drove her to different places. On all but one occasion, he kept her cell phone so she could not call for help. As in *Crawford*, the victim could not run away from Marshall because of her injuries, including a gunshot injury. A paramedic who responded to the scene testified that when he saw the victim, she "appeared to be visibly weak" and law enforcement assisted her in walking to the ambulance. The paramedic made the decision to transport the victim to a "level one trauma center" by helicopter, due, in part, to the victim's "trending declining vital signs." The paramedic further testified that it was "highly unlikely" that the victim would have survived without medical care. Because the evidence shows that, like in *Crawford*, Rice was too injured to run away and did not go with Marshall willingly, we hold that the evidence sufficiently establishes that Marshall abducted Rice.

## II. The Jury Selection Process

Marshall contends that the trial court erred in granting the Commonwealth's motion to strike Juror 31 and refusing to strike Jurors 18, 23, and 26 for cause based on their responses during voir dire. We disagree. Marshall's assignment of error regarding Juror 31 is waived because he did not object at trial to dismissal of Juror 31. Jurors 18, 23, and 26 answered that they would not credit witnesses' testimony simply based on the jurors' familiarity with the witnesses. Thus, the trial court did not abuse its discretion in finding these jurors free from exception.

"The right to be tried by an impartial jury is guaranteed under both the United States and Virginia Constitutions." *Taylor v. Commonwealth*, 61 Va. App. 13, 22 (2012); *see* Code

- 13 -

§ 8.01-358.  "For that guarantee to be effective, persons accused of violating criminal laws must be provided with 'an impartial jury drawn from a panel . . . free from exceptions.'"  *Taylor*, 61 Va. App. at 22 (quoting *Breeden v. Commonwealth*, 217 Va. 297, 300 (1976)).  "Every prospective juror must stand indifferent to the cause, 'and any reasonable doubt as to a juror's qualifications must be resolved in favor of the accused.'"  *Id.* at 23 (quoting *Breeden*, 217 Va. at 298).  "If there be a reasonable doubt whether the juror possesses these qualifications, that doubt is sufficient to insure his exclusion."  *Id.* (quoting *Breeden*, 217 Va. at 298).  "These principles must be strictly applied, and when a prospective juror equivocates about whether he or she has formed a fixed opinion, the prospective juror should be stricken by the trial court."  *Id.*  "The opinion entertained by a juror, which disqualifies him, is an opinion of that fixed character which repels the presumption of innocence in a criminal case, and in whose mind the accused stands condemned already."  *Id.* (quoting *Lovos-Rivas v. Commonwealth*, 58 Va. App. 55, 61 (2011)).  "Thus, the test of impartiality is whether the venireperson can lay aside the preconceived views and render a verdict based solely on the law and evidence presented at trial."  *Id.* (quoting *Lovos-Rivas*, 58 Va. App. at 61).

"It is prejudicial error for the trial court to force a defendant to use peremptory strikes to exclude a venireman from the jury panel if that person is not free from exception."  *Townsend v. Commonwealth*, 270 Va. 325, 329 (2005).  "The striking of any individual potential juror for cause, however, is committed to the sound discretion of the trial court."  *Id.*

Because it has the opportunity to see and hear each juror respond to questions posed during voir dire, the trial court "is in a superior position to determine whether a prospective juror's responses during *voir dire* indicate that the juror would be prevented from or impaired in performing the duties of a juror as required by the court's instructions and the juror's oath."  *Taylor*, 61 Va. App. at 23 (quoting *Lovos-Rivas*, 58 Va. App. at 61).

> Juror impartiality is a question of fact, and a trial court's decision
> to seat a juror is entitled to great deference on appeal.
> Accordingly, the decision to retain or exclude a prospective juror
> will not be disturbed on appeal unless there has been manifest error
> amounting to an abuse of discretion.

*Id.* at 23-24 (quoting *Lovos-Rivas*, 58 Va. App. at 61). In conducting our review on appeal, "we consider the juror's entire *voir dire*, not merely isolated statements." *Id.* at 24.

A. Juror 31

Marshall argues that the trial court erred in granting the Commonwealth's motion to strike Juror 31 for cause.

During initial voir dire, the trial court asked the potential jurors if any of them were sensible to any bias or prejudice against the Commonwealth or Marshall. Juror 31 raised his hand and said that he had a bias against the Commonwealth's Attorney because the juror's youngest son was serving a ten-year prison sentence. The prosecutor later moved to strike Juror 31 for cause based on his indication of bias. Other than noting that Juror 31 said that he "may harbor some bias," defense counsel raised no objection to the strike and "submit[ted] it to the [c]ourt." The trial court granted the Commonwealth's motion and struck Juror 31.

By raising no objection to the Commonwealth's motion to strike Juror 31 for cause, Marshall failed to preserve any such challenge for appellate review. Marshall does not invoke the good cause or ends of justice exceptions to Rule 5A:18, and the Court will not apply the exceptions sua sponte. *Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (en banc). Accordingly, Rule 5A:18 bars our consideration of this assignment of error on appeal.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "The purpose of th[e] contemporaneous objection requirement [in Rule 5A:18] is to allow the trial court a fair

opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials."

*Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015). "Specificity and timeliness undergird the contemporaneous-objection rule, animate its highly practical purpose, and allow the rule to resonate with simplicity." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019). "Not just any objection will do. It must be both *specific* and *timely* — so that the trial judge would know the particular point being made in time to do something about it." *Id.* (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)). If a party fails to timely and specifically object, he waives his argument on appeal. *Arrington v. Commonwealth*, 53 Va. App. 635, 641 (2009).

B. Jurors 18, 23, and 26

*Voir Dire of Juror 18*

During voir dire, Juror 18 responded that he knew one of the witnesses because the witness "is the father of a former classmate." The following exchange then took place:

> [COMMONWEALTH]: And given that relationship, would that make you more or less likely to believe him than anyone else?
>
> JUROR NUMBER EIGHTEEN: Yeah, I believe him to be a good guy, but, you know, I think -- I have to hear the testimony.
>
> [COMMONWEALTH]: You would need to hear the testimony before you made a decision?
>
> JUROR NUMBER EIGHTEEN: Uh-huh.

*Voir Dire of Juror 26*

During voir dire, Juror 26 responded that he had known Sergeant Ryan Moneyhon "since [Moneyhon] was a kid" because Moneyhon was a "contemporary with [Juror 26's] sons." The following exchange then took place:

> [COMMONWEALTH]: Okay. And knowing Ryan from a young age, is there anything that would make you more likely or less likely to believe him than anyone else who took the stand?

JUROR NUMBER TWENTY-SIX: I think he's a fine young man, and, you know, I would tend to believe him, yeah.

[COMMONWEALTH]: You would tend to believe him?

JUROR NUMBER TWENTY-SIX: Yeah.

[COMMONWEALTH]: Now, if he took the stand, would you be able to believe what he said on its face, judge it on its face without considering the fact that Ryan Moneyhon is the one speaking?

JUROR NUMBER TWENTY-SIX: Repeat your question.

[COMMONWEALTH]: I'm sorry. That was a little confusing.

JUROR NUMBER TWENTY-SIX: Yeah.

[COMMONWEALTH]: Would you be able to take Ryan's testimony on its face?

JUROR NUMBER TWENTY-SIX: Yes, I would.

[COMMONWEALTH]: And would you give it any more credence than you would . . .

JUROR NUMBER TWENTY-SIX: Absolutely not.

[COMMONWEALTH]: A police officer or another person on the street?

JUROR NUMBER TWENTY-SIX: No.

[COMMONWEALTH]: Okay. Thank you, sir.

*Voir Dire of Juror 23*

Juror 23 indicated that she knew Detective Brian Woodring and his wife from church "on a personal level." The following exchange took place:

[COMMONWEALTH]: And hearing testimony from Detective Woodring, would you be more or less likely to believe him than anyone else who took the stand?

JUROR NUMBER TWENTY-THREE: Probably. I mean, not more likely, but I find him as a very honest person.

[COMMONWEALTH]: You find him to be an honest person?

JUROR NUMBER TWENTY-THREE: Yes.

[COMMONWEALTH]: Okay.

JUROR NUMBER TWENTY-THREE: But I would want to hear the testimony.

[COMMONWEALTH]: But you would want to hear the testimony before making any sort of judgment?

JUROR NUMBER TWENTY-THREE: Definitely.

*Motions to Strike*

Marshall moved to strike Juror 26 for cause based on his familiarity with Sergeant Moneyhon. Marshall also moved to strike Jurors 18 and 23 because of their acquaintance with Detective Woodring and belief that he was honest or a "good" person. The trial court denied the motions to strike based on the jurors' assurances that they would not necessarily credit the police officers' testimony above that of other witnesses and would base their decisions on the evidence presented. Marshall argues that the trial court erred in refusing to strike Jurors 18, 23, and 26 for cause.

Knowing a witness, or even being related to a witness, does not automatically require a trial court to strike a juror for cause. In *Mayfield v. Commonwealth*, 59 Va. App. 839 (2012), this Court concluded that a juror's familial relationship with two witnesses did not require her to be struck for cause. The juror "answered, '[n]o,'" in response to being asked if her relationship with the witnesses would be "a problem in deciding the case," and in response to further questioning, she "confirmed that she could put aside her relationship with the witnesses and

- 18 -

impartially evaluate their testimony." 59 Va. App. at 842-43. This Court concluded that, when the juror confirmed that she could be impartial, "had no preconceived notions regarding the witnesses' truthfulness," and "could be fair to both [parties]," "the trial court did not abuse its discretion . . . i[n] declin[ing] to strike the juror for cause." *Id.* at 847-48.

Similarly, the record here contains no indication that the trial court committed manifest error by refusing to strike three members of the venire for cause simply because they knew two law-enforcement witnesses and had positive opinions of them. All three of the jurors indicated that they would not credit the witnesses' testimony simply based on the jurors' familiarity with the witnesses. Thus, we uphold the trial court's denial of the motions to strike.

### III. Admission of the 911 Call

Marshall argues that admission of the 911 call that Rice's brother made violated the Confrontation Clause and the rule against hearsay. We disagree because the call was nontestimonial hearsay and falls under the exceptions to the hearsay rule.

### A. Confrontation Clause

The Confrontation Clause prevents testimonial hearsay from being introduced at trial without opportunity to examine the declarant. *Canada v. Commonwealth*, 75 Va. App. 367, 381 (2022). In *Canada* "the Court explained what statements qualified as 'testimonial' and articulated the primary purpose test." *Id.* at 382.

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that *the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency*. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that *the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution*.

*Id.* (emphases added) (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)). "[A] 911 call [i]s nontestimonial when '[e]xamining all of the relevant circumstances, including the circuit

- 19 -

court's findings of fact regarding [the declarant's] demeanor and state of mind, . . . [the] statements to the emergency dispatcher were not made "with a primary purpose of creating an out-of-court substitute for trial testimony.""" *Id.* at 383 (all but first two alterations in original) (quoting *Cody v. Commonwealth*, 68 Va. App. 638, 660 (2018)).

Here, Rice's brother's statements to the 911 dispatcher were nontestimonial hearsay and did not violate the Confrontation Clause. Rice's brother called and told the 911 dispatcher that Rice had called him and told him that "her boyfriend had shot her and they were trying to kill her." Rice's brother stated that Rice could barely speak. He also stated that he "d[idn't] know what to do" because he doesn't live near Rice. He stated that "she told me I could not call her back or text her because he [Marshall] was sitting right there and it was just gonna get her killed faster." Rice's brother said it sounded like Rice "was hiding" while she was on the phone with him. These circumstances indicate that Rice's brother's call was to ask for help responding to an ongoing emergency—getting medical care for Rice's gunshot wound and getting Rice away from the ongoing threat of being killed by her attacker. Thus, Rice's brother's statements to the 911 dispatcher were nontestimonial hearsay and their admission did not violate the Confrontation Clause.

B. Hearsay

Marshall argues that Rice's brother's call to 911 operators relaying what Rice had told him is inadmissible hearsay evidence.

However, under Code § 8.01-390,

> A. Copies of records of this Commonwealth, of another state, of the United States, of another country, or of any political subdivision or agency of the same, other than those located in a clerk's office of a court, shall be received as prima facie evidence, provided that such copies are authenticated to be true copies either by the custodian thereof or by the person to whom the custodian reports, if they are different. . . .

- 20 -

B.  Records and recordings of 911 emergency service calls shall be deemed authentic transcriptions or recordings of the original statements if they are accompanied by a certificate that meets the provisions of subsection A and the certificate contains the date and time of the incoming call and the incoming phone number, if available, associated with the call.

In *Canada*, 75 Va. App. at 378 n.5 (quoting Code § 8.01-390), this Court found that although Code § 8.01-390 "is largely concerned with the public records hearsay exception, the plain language of the statute clearly states that evidence offered in compliance with the statute 'shall be received as *prima facie* evidence.'"  Thus, it is "one of the few statutes relating to document admissibility which satisfies the best evidence rule, the authentication requirement *and the hearsay rule*."  *Id.* (emphasis added) (quoting Kent Sinclair, *The Law of Evidence in Virginia* § 17-4[c][2] (8th ed. 2018)).  Based upon this Court's finding in *Canada*, the trial court did not err in concluding that the 911 recording was admissible under the statutory exception to the hearsay rule contained in Code § 8.01-390.  *See id*.

IV.  Admission of Evidence from Marshall's Instagram Account

Marshall argues that the trial court abused its discretion in admitting the photos and video from his Instagram account "[g]iven the lack of evidence connecting the rifle shown on the Instagram account and the weapon used to shoot Rice."  We disagree because such evidence was relevant.

"[W]e review a trial court's decision to admit or exclude evidence using an abuse of discretion standard and . . . will not disturb a trial court's decision to admit evidence absent a finding of abuse of that discretion."  *Kenner v. Commonwealth*, 299 Va. 414, 423 (2021) (first alteration in original) (quoting *Avent v. Commonwealth*, 279 Va. 175, 197 (2010)).  "In evaluating whether a trial court abused its discretion, . . . we do not substitute our judgment for that of the trial court.  Rather, we consider only whether the record fairly supports the trial court's action."  *Id.* (alteration in original) (quoting *Carter v. Commonwealth*, 293 Va. 537, 543

- 21 -

(2017)). "The abuse-of-discretion standard [also] includes review to determine that the discretion was not guided by erroneous legal conclusions." *Id.* (alteration in original) (quoting *Carter*, 293 Va. at 543-44).

Unless otherwise prohibited, "[a]ll relevant evidence is admissible[.]" Va. R. Evid. 2:402(a). "'Relevant evidence' means evidence having any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." Va. R. Evid. 2:401. "The scope of relevant evidence in Virginia is quite broad, as '[e]very fact, however remote or insignificant, that tends to establish the probability or improbability of a fact in issue is relevant.'" *Commonwealth v. Proffitt*, 292 Va. 626, 634 (2016) (quoting *Va. Elec. & Power Co. v. Dungee*, 258 Va. 235, 260 (1999) (alteration in original)).

Here, the evidence from Marshall's Instagram account makes more likely the fact that Marshall possessed the gun used to shoot Rice and that he shot Rice. Detective Massey testified that the gun depicted in Marshall's Instagram account had the same markings as the gun that the police seized from the Ford Focus. Rice identified the rifle found within reach of the driver's seat of the car as the gun Marshall used to shoot her. Thus, the photos and video from Marshall's Instagram account that the Commonwealth introduced were relevant to link him to the weapon he used against Rice and to show that Marshall remained in possession of the gun when the police found him. For these reasons, the video and photos showing the rifle were relevant and the trial court did not abuse its discretion in admitting them.

### V. Denial of Marshall's Motion to Suppress

Marshall contends that the trial court erred in denying his motion to suppress statements he made in the presence of the police. He maintains that the police subjected him to custodial interrogation in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). We

disagree because such statements were either not the product of custodial interrogation or not admitted at trial.

"In reviewing the denial of a motion to suppress, we 'consider the facts in the light most favorable to the Commonwealth, the prevailing party at trial.'" *Aponte v. Commonwealth*, 68 Va. App. 146, 156 (2017) (quoting *Hairston v. Commonwealth*, 67 Va. App. 552, 560 (2017)). "It is the appellant's burden to show that when viewing the evidence in such a manner, the trial court committed reversible error." *Id.* (quoting *Hairston*, 67 Va. App. at 560).

A. Statements to Neiman and Massey

Marshall contends that the trial court erred in denying his motion to suppress statements he made while Deputy Neiman transported him to the sheriff's office and statements he made to Lieutenant Massey after the probable cause hearing. Marshall asserts such statements were made in violation of *Miranda*.

"The principle is now well-established that, pursuant to the Fifth Amendment of the United States Constitution, law enforcement officers must inform a suspect in a custodial interrogation of certain rights, including the right to remain silent and to have the assistance and presence of legal counsel during the interrogation." *Bass v. Commonwealth*, 70 Va. App. 522, 539-40 (2019) (quoting *Stevens v. Commonwealth*, 283 Va. 296, 302 (2012)). If a suspect waives his right to an attorney after he has received *Miranda* warnings, the police "are free to interrogate him, but if the suspect requests counsel at any time during the interrogation, the interrogation must cease until an attorney has been made available to the suspect or the suspect reinitiates the interrogation." *Id.* at 540 (quoting *Commonwealth v. Redmond*, 264 Va. 321, 328 (2002)).

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and

custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Commonwealth v. Ferguson*, 278 Va. 118, 124 (2009) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). We must determine "whether an objective observer would view an officer's words or actions as designed to elicit an incriminating response." *Timbers v. Commonwealth*, 28 Va. App. 187, 196 (1998) (quoting *Blain v. Commonwealth*, 7 Va. App. 10, 15 (1988)).

The record supports the trial court's finding that Neiman and Massey did not subject Marshall to interrogation or its functional equivalent.

Marshall had a long, mostly one-sided conversation with Neiman on the ride back to the police station. Marshall did most of the talking, but Neiman occasionally responded. Neiman asked Marshall, "You doing all right man?" and, "you still tired?" Sometimes he'd respond, "I don't understand what you're saying, buddy." At the beginning of the conversation, Neiman clarified to Marshall, "I'm not trying to violate your rights or nothing . . . I'm just gonna be as respectful as I can." In response to Marshall talking about Neiman putting him in handcuffs, Neiman explained, "I was just doing it for officer safety and for everybody's safety, that's all" — "I didn't mean you no harm." Neiman often responded to Marshall's conversation with "uh-huh," "yeah," "right," "wow," or "okay." At times Neiman communicated his whereabouts and plan to deal with Marshall over the police radio. Also during the ride, Neiman asked express questions in response to express questions Marshall asked Neiman. Marshall asked Neiman, "how was your day, though?" to which Neiman responded, "It was good, how was yours?" Marshall answered: "It was horrible," to which Neiman reiterated, "horrible day?" Marshall also asked Neiman, "you know, I found evidence of her [Rice] almost burning me?" to which Neiman responded, "[b]urning you?" Marshall also asked, "[s]o you know the park, right?" to which Neiman responded, "[t]he what?" When Marshall attempted to discuss the merits of the potential case against him by asking, "hey, is that Michael

Kors bag going to go . . . in my evidence file?" Neiman asked, "what's that?" Marshall clarified, "the Michael Kors bag in the car," to which Neiman responded, "I'm not sure what you're talking about." Marshall also asked, "did you guys search the vehicle?" to which Neiman responded, "I've been with you the entire time."

Marshall also argues that statements he made to Lieutenant Massey after Marshall's probable cause hearing with the magistrate were made in violation of *Miranda*. But, like with Marshall's statements to Neiman, Massey did not subject Marshall to interrogation or its functional equivalent. Like the conversation with Neiman, Marshall does most of the talking, with Massey occasionally responding. After the magistrate issues a protective order for the benefit of Rice against Marshall, Marshall makes a comment about the expiration date of the order. Massey tells Marshall that the protective order date could be extended. Marshall responds by asking for a counter protective order and surveillance on Rice's social media. Massey asks, "What's her Facebook page?" to which Marshall responds. Later, Marshall talks about whether his out-of-state address would affect him getting "bond," to which Massey responds, "I think it doesn't matter what kind of address you had . . . she has a guideline to go by because of the charge itself." In response to Marshall asking about a specific McDonald's, Massey asks Marshall, "is that where you w[ere] working? The one in Dover?" to which Marshall responds in the affirmative. Marshall then talks about discovering Rice cheating on him, saying, "I caught her!" Massey asks, "was it one of your boys?" to which Marshall responds he doesn't know the details. Marshall goes on, describing the situation of Rice cheating on him. Massey follows up, "[s]o you don't know if it was one of your boys," to which Marshall responds that he does know it was one of them. Massey asks more questions, such as if Marshall's "boy" was in "King George" and if it was "DQ." Marshall later makes a comment about Rice being in the next room and wanting her to come join him, to which Massey responds, "[n]o, she's at the hospital!" At the

- 25 -

end of the conversation, Massey tells Marshall that they have to "take [him] back over here," to get him fingerprinted and get his picture taken so that after, they "can take [him] up the road." He also gives Marshall a cinnamon bun because "[he] told him [he] would." Throughout the conversation, while Marshall is talking, Massey makes comments like, "okay," "right," "I hear you," "Is that right?," and "that's your girl?!"

Although Neiman and Massey asked some express questions of Marshall, Neiman's and Massey's questions were not designed to aid in factfinding, but to carry on polite conversation with Marshall and some questions were to inquire of his wellbeing. Neiman's and Massey's other responses were not reasonably likely to elicit an incriminating response from the suspect. Thus, we conclude that because Neiman and Massey did not subject Marshall to interrogation or its functional equivalent, Neiman and Massey did violate Marshall's *Miranda* rights. Accordingly, the trial court did not err in denying Marshall's motion to suppress any statements Marshall made to Neiman during the car ride or to Massey after the probable cause hearing.

B. Statements to Clift

Marshall also maintains that the trial court should have suppressed statements about his background that he made to Detective Monty Clift before the officer read his *Miranda* warnings. In his brief, other than characterizing the exchange as Detective Clift asking him "background questions," Marshall identifies no statements elicited by Detective Clift that were introduced at trial or led to the discovery of other evidence. Therefore, any consideration of the admissibility of Marshall's possible statements to Detective Clift is moot.[6] *See Jenkins v. Commonwealth*, 244 Va. 445, 452 (1992).

---

[6] In any event, the trial court held inadmissible Detective Clift's comment to Marshall that the detective "would talk if [his] girlfriend was shot."

- 26 -

C. Summary

Because Marshall's statements were not made in violation of *Miranda* or were not admitted at trial, we hold that the trial court did not err in denying Marshall's motion to suppress.

VI. Denial of Marshall's Motion for Expert Witness

Marshall argues that the trial court erred in denying Marshall's motion for an expert witness. We disagree because Marshall has only shown a hope or suspicion that favorable evidence may be procured from the expert.

"[A]n indigent defendant seeking the appointment of an expert has the burden of showing a particularized need therefor." *Barnabei v. Commonwealth*, 252 Va. 161, 171 (1996). In *Barnabei*, the Court held that "Barnabei failed to make the particularized showing that would have entitled him to the appointment of an expert forensic pathologist at the Commonwealth's expense." *Id.* Rather, "[a]t most, Barnabei hoped or suspected that an expert might testify that the injuries to [the victim]'s vagina and anal opening did not necessarily result from force." *Id.* The Court concluded that Barnabei had only shown "[a] hope or suspicion that favorable evidence may be procured from an expert" and that such hope or suspicion "is not sufficient to require the appointment of an expert." *Id.*

This case is almost identical to *Barnabei*. On brief, Marshall argues that a medical expert would have helped him refute medical testimony it predicted that the Commonwealth would introduce (and later did) that the victim was shot at close range. Like Barnabei, Marshall hoped that a medical expert would testify that the victim was shot from a further range, in support of the victim's first statement that she was shot in a drive-by shooting. But, as in *Barnabei*, Marshall has only shown a hope or suspicion that favorable evidence may be procured from an expert. Thus, the trial court did not abuse its discretion in denying Marshall's request for an expert witness.

- 27 -

## VII. Denial of Motion for *Ex Parte* Hearing

Marshall argues that the trial court erred in denying his motion for an *ex parte* hearing on his request for a court-appointed expert. We disagree because denial of such a hearing was harmless error.

"[U]nder Code § 8.01-678, a harmless error review is required in all cases, unless otherwise provided by another statute." *Commonwealth v. Kilpatrick*, 301 Va. 214, 216 (2022). Code § 8.01-678 provides that "[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed." For alleged error related to the denial of a motion for appointment of an expert, we review whether the error "was harmless beyond a reasonable doubt." *Sanchez v. Commonwealth*, 41 Va. App. 340, 353 (2003) (quoting *Chapman v. California,* 386 U.S. 18, 24 (1967)). "Under that standard, a constitutional error may not be declared harmless if there is a 'reasonable possibility' that the 'error contributed to the verdict.'" *Id.* (quoting *Tuggle v. Netherland*, 79 F.3d 1386, 1392 (4th Cir. 1996)).

Assuming, without deciding, that it was error to deny Marshall an *ex parte* hearing, we conclude that any such error was harmless. Marshall has not pointed to any specific evidence that he would have presented at the *ex parte* hearing that would have changed the outcome of his motion for an expert witness. Instead, he generally argues that failing to hold an *ex parte* hearing "would have compelled Marshall to disclose trial strategy and divulge information and communication between counsel and her client in the presence of the Commonwealth in violation of Marshall's right to counsel under the 6th Amendment to the U.S. Constitution." He also argues that "denying Marshall an ex parte hearing would have required Marshall's counsel [to] mak[e] proffers of evidence that . . . may have been incriminating for Marshall in violation of his Fifth Amendment rights." Because Marshall has not shown how holding an *ex parte*

- 28 -

hearing would have changed the outcome of his motion for an expert witness, this error was harmless. *Cf. Weeks v. Commonwealth*, 248 Va. 460, 472 (1994) ("[W]e hold that the court did not commit reversible error because nothing in the record suggests that the trial court's rulings prejudiced defendant's right to fairly defend himself.").

### VIII. Denial of Motion to Dismiss on Constitutional Speedy Trial Grounds

Marshall argues that the trial court erred in denying his motion to dismiss the charges against him because he was denied his constitutional right to a speedy trial. We disagree because the four speedy trial factors, on balance, weigh in the Commonwealth's favor. This is so because the delay attributable to the Commonwealth was validly justified, in part by pandemic concerns, and Marshall has not shown the requisite showing of prejudice.

The Sixth Amendment provides in part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const. amend. VI. "The determination of whether an accused has been denied the constitutional right to a speedy trial requires 'a difficult and sensitive balancing process' in which the court examines on an *ad hoc* basis the conduct of both the state and the accused which led to a delay in prosecution." *Kelley v. Commonwealth*, 17 Va. App. 540, 544 (1994) (quoting *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). "A claim of a violation of speedy trial rights under the federal constitution is resolved by the balancing of four factors - length of delay, reason for delay, defendant's assertion of his right, and prejudice to the defendant." *Howard v. Commonwealth*, 281 Va. 455, 462 (2011). "None of the factors is either 'necessary or sufficient' to finding a violation." *Ali v. Commonwealth*, 75 Va. App. 16, 35 (2022). "Instead, 'they are related factors that "must be considered together with . . . other [relevant] circumstances."'" *Id.* (alterations in original) (quoting *Kelley*, 17 Va. App. at 544). "On appeal, *a defendant* must establish that 'on balance,' the factors 'weigh in his favor.'" *Id.* (emphasis added) (quoting *United States v. Thomas*, 55

F.3d 144, 148 (4th Cir. 1995)).  Here, Marshall has not established that the factors weigh in his favor.

## Factor 1: Length of Delay

If the length of delay is "presumptively prejudicial," we must review the remaining *Barker* factors.  *Beachem v. Commonwealth*, 10 Va. App. 124, 131 (1990) (quoting *Fowlkes v. Commonwealth*, 218 Va. 763, 766 (1978)).  "The delay is calculated from the time of arrest." *Ali*, 75 Va. App. at 35.  "It is well established that delay 'approach[ing] one year' is 'presumptively prejudicial' and requires further review."  *Id.* (alteration in original) (quoting *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992)).

Here, Marshall was arrested on February 27, 2018, and his jury trial began on May 3, 2021, a delay of greater than three years.  This delay is longer than a year, so it is presumptively prejudicial, triggering review of the remaining *Barker* factors.

## Factor 2: Reason for the Delay

In assessing the second factor in *Barker*, the reasons for delay of trial, this Court must "determine[] which portion of the delay between the appellant's arrest and his trial is attributable to him and which portion counts against the Commonwealth."  *Id.* at 36.  In addition, this Court also must decide "what part of any delay not attributable to the defendant was 'justifiable.'"  *Id.*

As this Court has explained, "Although any delay not attributable to the defendant is the responsibility of the Commonwealth for speedy trial purposes, 'different weights should be assigned to different reasons' for delay."  *Id.* at 42 (quoting *Barker*, 407 U.S. at 531).  "*Barker* recognizes three categories of fault for delay attributable to the government — delay that is deliberately improper, merely negligent, and valid and unavoidable."  *Id.*  "Deliberate delay, such as that caused with an intent to 'hamper the defense' or harass the defendant, 'should be weighted heavily against the government,' in this case the Commonwealth."  *Id.* (quoting

*Barker*, 407 U.S. at 531).  "Negligence in scheduling, understaffing of a prosecutor's office, or 'overcrowd[ing of the] courts' receives 'less' weight 'but nevertheless [is] considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.'" *Id.* (alterations in original) (quoting *Barker*, 407 U.S. at 531).  "Finally, a reason deemed 'valid' fully 'justif[ies] appropriate delay.'" *Id.* (alteration in original) (quoting *Barker*, 407 U.S. at 531).  After Marshall was charged and arrested, "on March 16, 2020, the Supreme Court of Virginia issued its first judicial emergency order in response to the COVID-19 pandemic, restricting trials and non-emergency proceedings as a result." *Id.* at 27.  "In the months that followed, the Supreme Court issued additional emergency orders that suspended jury trials entirely for a period of about eight weeks." *Id.*  "The Court then directed that jury trials could be resumed by each judicial circuit that received approval of a written plan detailing how that circuit would conduct such trials safely in light of the pandemic." *Id.* at 27-28.  "A pandemic-related delay is 'valid, unavoidable, and outside the Commonwealth's control.'" *Brown v. Commonwealth*, 75 Va. App. 388, 409 (2022) (quoting *Ali*, 75 Va. App. at 45).

Marshall concedes that the delays from October 2018 through May 27, 2020, were attributable to him.  But even if the remainder of the delay, from May 28, 2020, to May 3, 2021, was attributable to the Commonwealth as Marshall asserts, there is a valid justification for this period of delay.  At Marshall's hearing on his speedy trial motion on February 1, 2021, the trial court stated that the trial court "only recently, on January 20th . . . received a letter from the Supreme Court . . . that stated that th[e trial c]ourt now has authority to have a jury trial in this courthouse."  The trial court further stated that there was an "inability to [hold jury trials] within just a few days because of the number of things that have to occur before a jury trial can happen."

Thus, we conclude that the delay from May 28, 2020, to January 20, 2021, was validly justified due to the pandemic and concerns with holding jury trials. We also conclude that the delay from January 20, 2021, until May 3, 2021, is attributable to the ordinary course of the administration of justice because the trial court stated that "a number of things" had to occur before the trial court would be ready to hold jury trials after receiving the Supreme Court's approval. Further, the trial court did not find and Marshall does not argue that this delay was intentional or due to the Commonwealth's negligence. Accordingly, we conclude the entire period of delay attributable to the Commonwealth had a valid justification.

Factor 3: Assertion of Speedy Trial Rights

"The third factor in the balancing test involves whether the accused asserted his right to a speedy trial." *Ali*, 75 Va. App. at 46. "[D]elay in asserting the right weighs against finding a violation." *Id.* "This factor also permits the court to 'weigh the frequency and force of the [objection to delay] as opposed to attaching significant weight to a purely *pro forma* objection.'" *Id.* (alteration in original) (quoting *Rogers v. Commonwealth*, 5 Va. App. 337, 347 (1987)).

Here, Marshall first asserted his speedy trial rights on May 28, 2020. By that time, he had been in custody for over two years. *Cf. id.* (noting that the defendant first asserted his speedy trial rights after being in custody for six and one-half months). "Additionally, he did not assert this right until after the Supreme Court had already begun entering judicial emergency orders restricting the ability of circuit courts to conduct jury trials." *Id.*

> Therefore, while [Marshall]'s assertion of his constitutional right to a speedy trial is entitled to some weight, it deserves less weight than that to which it would have been entitled if he had raised it earlier, at a time before the pandemic severely limited the possibility that he could be tried promptly.

*Id.*

Factor 4: Prejudice to Appellant

The final factor is prejudice. "The constitutional speedy trial right protects three related interests: '(1) preventing oppressive pretrial incarceration; (2) minimizing the accused's anxiety; and (3) limiting the possibility that the defense will be impaired.'" *Id.* at 47 (quoting *Kelley*, 17 Va. App. at 546). The third interest is the "most important" "because the inability of a defendant to prepare his case skews the fairness of the entire system." *Id.* (quoting *Doggett*, 505 U.S. at 654).

Prejudice is assessed under a "three-tiered test" depending on the government's "degree of culpability" in the delay. *Id.* (quoting *Shavin v. Commonwealth*, 17 Va. App. 256, 268 (1993)). If the Commonwealth intentionally delayed prosecuting the defendant, the "'delay will be weighed heavily against the government' even if 'the accused cannot demonstrate exactly how it has prejudiced him.'" *Id.* (quoting *Doggett*, 505 U.S. at 656-57). In contrast, "if the Commonwealth bears no fault in the delay and proceeds 'with reasonable diligence,' then the defendant's 'speedy trial claim w[ill] fail . . . as a matter of course however great the delay, so long as [the defendant cannot] show specific prejudice.'" *Id.* (alterations in original) (quoting *Doggett*, 505 U.S. at 656). If the delay was "caused by governmental negligence," it "occupies the middle ground." *Id.* (quoting *Doggett*, 505 U.S. at 656-57).

"To prove even generalized prejudice based on one of the first two interests identified in *Barker* (preventing oppressive pretrial incarceration and minimizing the accused's anxiety), a defendant must establish a particularly prolonged or restrictive period of incarceration or a level of anxiety exceeding that faced by others awaiting trial." *Id.* at 48; *see id.* at 49-50 (concluding that the defendant's general assertion that "his 'extended' incarceration . . . was 'oppressive'" "d[id] not meet the standard for proving the required degree of prejudice"). "To prove specific prejudice under the third interest (limiting the possibility of impairing the defense), a defendant

must show 'in what specific manner' factors such as missing witnesses, missing evidence, or improved access to counsel 'would have [impaired or] aided the defense.'" *Id.* at 49 (alteration in original) (quoting *United States v. Medina*, 918 F.3d 774, 782 (10th Cir. 2019)); *see Kelley*, 17 Va. App. at 548 ("In the absence of some showing or suggestion by Kelley that facts or evidence favorable to him existed which [the witness] had forgotten or could not recall, it is mere speculation that [the witness]'s memory loss impaired Kelley's defense.").

Here, as we hold in our analysis of factor two above, the delay attributable to the Commonwealth—due to the pandemic and attributable to the ordinary course of the administration of justice—was validly justified. Thus, Marshall must show specific prejudice. The trial court found that Marshall had not established any specific prejudice. Marshall argues that "[h]e was subject to unnecessary anxiety and concern" and that "[a]ny chance of finding information to corroborate Rice's allegations" that she was shot in a drive-by shooting "was remote at best." Yet, we conclude that Marshall's general assertion that his incarceration caused him "unnecessary anxiety and concern" does not meet the standard for proving the required degree of prejudice. We also conclude that he has not met the standard for showing specific prejudice to his defense. He has only argued generally that the delay resulted in a remote chance of finding information about an alleged drive-by shooting as the cause of Rice's gunshot wounds. Marshall has not shown or suggested that specific facts or evidence favorable to him no longer existed as a result of the delay. Thus, Marshall has not made the requisite showing of prejudice under this factor.

Weighing all Four Factors

All four factors, considered together, weigh in favor of the Commonwealth. Although the length of delay triggers a review of the other factors, as the delay attributable to the Commonwealth is validly justified, factor two weighs in the Commonwealth's favor. Factor

three is entitled to some, but not much, weight.  Because Marshall failed to make the requisite showing of prejudice under factor four, this factor weighs in the Commonwealth's favor.  Thus, we hold that Marshall's speedy trial rights were not violated, and the trial court did not err in so finding.

IX.  Imposition of Sentence Outside Sentencing Guidelines

Marshall argues that the trial court abused its discretion in imposing a sentence that exceeded the applicable sentencing guidelines.  We disagree because Marshall's sentences did not exceed the statutory maximums.

"We review the trial court's sentence for abuse of discretion." *Scott v. Commonwealth*, 58 Va. App. 35, 46 (2011).  "[W]hen a statute prescribes a maximum imprisonment penalty and the sentence does not exceed that maximum, the sentence will not be overturned as being an abuse of discretion." *Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016) (quoting *Alston v. Commonwealth*, 274 Va. 759, 771-72 (2007)).  "The sentencing guidelines are advisory only and do not require trial courts to impose specific sentences." *Runyon v. Commonwealth*, 29 Va. App. 573, 577-78 (1999).  "[T]he recommended sentencing ranges contained in these discretionary guidelines are not binding on the trial judge but, rather, are mere tools to be used by the judge in fixing an appropriate sentence within the limitations established by the statute governing punishment for the particular crime." *Luttrell v. Commonwealth*, 42 Va. App. 461, 465 (2004).  A judge's failure to follow the sentencing guidelines "shall not be reviewable on appeal or the basis of any other post-conviction relief." Code § 19.2-298.01(F).  Accordingly, we may only consider whether the sentence fell outside the permissible statutory range. *See Smith v. Commonwealth*, 26 Va. App. 620, 626 (1998); *Valentine v. Commonwealth*, 18 Va. App. 334, 339 (1994).

Here, the trial court did not abuse its discretion in sentencing Marshall because the sentences did not exceed the statutory maximums. The trial court sentenced Marshall to 20 years of imprisonment for aggravated malicious wounding, 2 years for attempted murder, 5 years for abduction, 3 years for strangulation, and 3 years for using a firearm in the commission of a felony. These sentences were within the ranges set by the legislature. *See* Code §§ 18.2-10, -26, -32, -47, -51.2, -51.6, and -53.1. Thus, we hold that the trial court did not abuse its discretion in its determination of Marshall's sentence.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

*Affirmed.*